No. 2014-1005

# In the
# United States Court of Appeals
# for the Federal Circuit

UNILOC LUXEMBOURG S.A., UNILOC USA, INC.,

*Plaintiffs-Appellants,*

v.

ECLINICAL WORKS, LLC, PULSE SYSTEMS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California in Nos. 2:13-cv-03244-MWF-PLA, 2:13-cv-03246-MWF-PLA, Judge Michael W. Fitzgerald

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS UNILOC LUXEMBOURG S.A. AND UNILOC USA, INC.

Lawrence M. Hadley
   *Principal Attorney*
Alan P. Block
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA 90017
Tel.: (213) 694-1135
Fax: (213) 694-1234
*lhadley@mckoolsmithhennigan.com*
*ablock@mckoolsmithhennigan.com*

Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
Tel.: (214) 978-4014
Fax: (214) 978-4044
*dgeyser@mckoolsmith.com*

James L. Etheridge
ETHERIDGE LAW GROUP
2600 E. Southlake Blvd.,
   Suite 120-324
Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
*jim@etheridgelaw.com*

*Counsel for Plaintiffs-Appellants*

No. 2014-1005

# In the
# United States Court of Appeals
# for the Federal Circuit

UNILOC LUXEMBOURG S.A., UNILOC USA, INC.,

*Plaintiffs-Appellants,*

v.

ECLINICAL WORKS, LLC, PULSE SYSTEMS, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California in Nos. 2:13-cv-03244-MWF-PLA, 2:13-cv-03246-MWF-PLA, Judge Michael W. Fitzgerald

## CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Uniloc Luxembourg S.A. and Uniloc USA, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

Uniloc Luxembourg S.A. and Uniloc USA, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> **MᴄKᴏᴏʟ Sᴍɪᴛʜ Hᴇɴɴɪɢᴀɴ, P.C.:**  Lawrence M. Hadley; Roderick G. Dorman; Alan P. Block; and Jeffrey Huang

> **MᴄKᴏᴏʟ Sᴍɪᴛʜ, P.C.:** Daniel L. Geyser

> **Eᴛʜᴇʀɪᴅɢᴇ Lᴀw Gʀᴏᴜᴘ:** James L. Etheridge

Respectfully submitted.

/s/ *Daniel L. Geyser*

James L. Etheridge
Eᴛʜᴇʀɪᴅɢᴇ Lᴀw Gʀᴏᴜᴘ
2600 E. Southlake Blvd.,
  Suite 120-324
Southlake, TX  76092
Tel.:  (817) 470-7249
Fax:  (817) 887-5950
*jim@etheridgelaw.com*

Daniel L. Geyser
MᴄKᴏᴏʟ Sᴍɪᴛʜ, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

Lawrence M. Hadley
  *Principal Attorney*
Alan P. Block
MᴄKᴏᴏʟ Sᴍɪᴛʜ Hᴇɴɴɪɢᴀɴ, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA  90017
Tel.:  (213) 694-1135
Fax:  (213) 694-1234
*lhadley@mckoolsmithhennigan.com*
*ablock@mckoolsmithhennigan.com*

*Counsel for Plaintiffs-Appellants Uniloc Luxembourg S.A. and Uniloc USA, Inc.*

January 17, 2014

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................i

TABLE OF AUTHORITIES .................................................................vi

STATEMENT OF RELATED CASES .................................................ix

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .......................................................2

STATEMENT OF THE ISSUES .............................................................2

STATEMENT OF THE CASE ...............................................................3

    I.     THE '526 PATENT INTRODUCES A REVOLUTIONARY APPROACH TO PATIENT-INFORMATION MANAGEMENT ...............................................................3

    II.    STATUTORY AND REGULATORY FRAMEWORK ......................8

    III.   DEFENDANTS' SOFTWARE OBTAINS "COMPLETE EHR" CERTIFICATION UNDER FEDERAL REGULATIONS ...............................................................11

    IV.   LITIGATION AND PROCEEDINGS BELOW ................................14

SUMMARY OF ARGUMENT ...............................................................20

STANDARD OF REVIEW .....................................................................26

ARGUMENT ..........................................................................................27

    I.     BECAUSE UNILOC PRESENTED COMPELLING EVIDENCE OF THREE SEPARATE THEORIES OF DIRECT INFRINGEMENT, THE DISTRICT COURT WRONGLY GRANTED SUMMARY JUDGMENT .......................27

         A.    The Court's Decision On Internal Testing Reflects Multiple Errors Of Law And Logic ..........................................27

# TABLE OF CONTENTS
## (continued)

                                                                              **Page**

        1.    Uniloc's Evidence Of Internal Testing Readily
                Confirms That Defendants Actually (Not
                *Hypothetically*) Performed Every Ordered Step Of
                Claim 1, And The Court's Contrary Conclusion Is
                Inconsistent With Circuit Law.........................................27

        2.    According To Its Plain Text, Claim 1 Does Not
                Contain *Any* "Patient" Requirement, And The
                Court's Contrary Holding Misreads The Patent
                And Unambiguous Record Evidence ............................37

   B.    The Court's Decision Regarding The CCHIT
            Demonstration Is At Odds With Circuit Law, The
            Patent's Terms, The Court's Own Claim Construction,
            And Record Evidence ...............................................43

        1.    Defendants Practiced Each And Every Sequential
                Step By Demonstrating Compliance With
                CCHIT's Testing Procedures..........................................43

        2.    The Court's Contrary Determination Is Predicated
                On Multiple Legal And Factual Errors..........................47

   C.    Because Defendants' Software Is Self-Contained And
            Automatically Performs Every Step Of The Claimed
            Method, It Directly Infringes The '526 Patent—And The
            Court's Contrary Holding Conflicts With Circuit
            Precedent ................................................................55

II.    THE COURT'S SUMMARY JUDGMENT ON INDIRECT
        INFRINGEMENT IS INCOMPATIBLE WITH
        CONTROLLING LAW AND IRRECONCILABLE WITH
        RECORD EVIDENCE......................................................60

   A.    Defendants' Software Is Predictably Used To Infringe,
            And The Court Wrongly Set Aside Uniloc's Showing By
            Unduly Restricting The Role Of Circumstantial Evidence ......61

iv

# TABLE OF CONTENTS
## (continued)

**Page**

B.    Defendants' User Manuals Specifically Instruct Clients
How To Perform The Claimed Method, A Fact
Confirming The Predictability Of Infringing Use ....................64

CONCLUSION ........................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*A.B. Dick, Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed. Cir. 1983) ................. 34, 35

*Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490 (Fed. Cir. 1986) ........................................................................................................63

*Allen Eng'g Corp. v. Partell Indus.*, 299 F.3d 1336 (Fed. Cir. 2002) .....................49

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................26

*Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348 (Fed. Cir. 2013) ................................................................................ 26, 39

*E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213 (Fed. Cir. 2007) .............. *passim*

*Ericsson Inc. v. D-Link Sys.*, 2013 U.S. Dist. LEXIS 110585 (E.D. Tex. Aug. 6, 2013) ........................................................................................57

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197 (Fed. Cir. 2010) ....... 58, 59

*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988) ...........33

*Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321 (Fed. Cir. 2010) ...................................43

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed. Cir. 2012) ....................................................................63

*Intellect Wireless, Inc. v. T-Mobile USA, Inc.*, 735 F. Supp. 2d 928 (N.D. Ill. 2010) ........................................................................................59

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ............ *passim*

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed. Cir. 2012) ................ 62, 65

*Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261 (Fed. Cir. 1986) ....... 35, 65

*Optium Corp. v. Encore Corp.*, 603 F.3d 1313 (Fed. Cir. 2010) ............................26

*Osram Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698 (Fed. Cir. 2012) ........................................................................................27

*Prima Tek II LLC v. Polypap, SARI*, 412 F.3d 1284 (Fed. Cir. 2005) ...................32

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) .............................23

*Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed. Cir. 2008) ............59

*SiRF Tech., Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010) ..................... 24, 57, 58, 60

*SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186 (Fed. Cir. 2008) ..............26

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) ..................59

*Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009).... 26, 61, 62

## Statutes

28 U.S.C. § 1295(a) ................................................................................................2

28 U.S.C. § 1331 ....................................................................................................2

28 U.S.C. § 1338(a) ................................................................................................2

28 U.S.C. § 2107(a) ................................................................................................2

35 U.S.C. § 271(a) ........................................................................................... 23, 60

42 U.S.C. § 300jj(13) ..............................................................................................9

42 U.S.C. § 300jj-11(a) ...........................................................................................9

42 U.S.C. § 300jj-11(b) ...........................................................................................9

42 U.S.C. § 300jj-11(b)(2) .......................................................................................9

42 U.S.C. § 300jj-11(b)(4) .......................................................................................9

42 U.S.C. § 300jj-11(c)(1) .......................................................................................9

42 U.S.C. § 300jj-14 ...............................................................................................9

42 U.S.C. § 300jj-31 ...............................................................................................9

## Regulations

45 C.F.R. § 170.102 ...............................................................................................53

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

45 C.F.R. § 170.300(a)...................................................................9

45 C.F.R. § 170.302(a).............................................................. 10, 21

45 C.F.R. § 170.302(a)-(h)..........................................................10

45 C.F.R. § 170.304(e)...............................................................10

45 C.F.R. § 170.402 ..................................................................11

45 C.F.R. § 170.445(a)...............................................................11

45 C.F.R. § 170.502 ..................................................................11

45 C.F.R. § 170.545(a)...............................................................11

## Other Authorities

Health Information Technology for Economic and Clinical Health Act,
  Pub. L. No. 111-5, div. A, tit. XIII, § 13001(a), 123 Stat. 115, 228
  (2009) ................................................................... 8, 9, 11

## Rules

Fed. R. App. P. 4(a) ...................................................................2

Fed. R. Civ. P. 56 ............................................................... *passim*

Fed. R. Civ. P. 56(f) ............................................................. 33, 52

## STATEMENT OF RELATED CASES

Pursuant to Fed. Cir. R. 47.5, Plaintiffs-Appellants Uniloc Luxembourg S.A. and Uniloc USA, Inc. (Uniloc) respectfully submit that:

(a) there have been no other previous appeals in this case; and

(b) there are no cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

This case involves patented methods that teach a revolutionary change in health-care software. Uniloc replaced the traditional "flowchart" approach with a method for designing a "patient-information hierarchy" for storing and linking data in discrete, structured formats. Patients are efficiently tracked, medical providers seamlessly share information, and doctors receive instant access to critical data—including automatic alerts for potential issues (*e.g.*, drug-drug or drug-allergy contraindications) essential for optimal care. These improvements are so vital that Congress imposed federal standards for certifying electronic health records, and awards substantial subsidies for those attaining federal certification.

Defendants eClinical Works (ECW) and Pulse Systems (Pulse) manufacture and sell software that repeatedly practice the sequential steps of Uniloc's claimed method. Uniloc established below that Defendants practice that method when designing and embedding an initial "hierarchy" in their software, extensively testing the software's features, demonstrating its functionality to obtain federal certification, and deploying it to customers, who activate the software's self-contained functionality in its ordinary, expected, intended operation. Yet despite this comprehensive showing, the district court scrapped multiple theories of direct and indirect infringement in granting summary judgment of non-infringement. That holding is at odds with circuit law, inconsistent with the patent's text, and incompatible

with the record evidence—especially once that evidence is properly construed in Uniloc's favor. The court's judgment is incorrect and should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), and this Court has jurisdiction under 28 U.S.C. § 1295(a). The notice of appeal was filed on September 26, 2013, after final judgment was entered on August 29, 2013. Under 28 U.S.C. § 2107(a) and Fed. R. App. P. 4(a), Uniloc's appeal is timely.

## STATEMENT OF THE ISSUES

This appeal implicates critical questions regarding the sequential performance of ordered steps in claimed methods. The issues presented are:

1. A. Whether Defendants directly infringed via internal testing, where (i) Defendants exhaustively tested every feature of their software; (ii) Defendants could not test the software's full functionality *without* sequentially performing the claimed steps; and (iii) any intervening steps were irrelevant to the claimed functions.

B. Whether Defendants directly infringed by complying with federal certification standards, where obtaining certification is impossible *without* sequentially performing the claimed steps.

C. Whether the court erred in finding a method claim non-infringed based on Defendants' "manufacture or sale" of software, where (i) Uniloc's theory relied on

2

"*use*," not "manufacture or sale"; and (ii) Defendants' software is self-contained, and operates automatically upon activation to perform the claimed method.

2. Whether the court effectively eliminated the role of circumstantial evidence in proving indirect infringement of method claims, on the logic that "circumstances," however clear, only prove "possib[le] use," not *actual* use, and method claims are not satisfied by proving mere "capacity."

## STATEMENT OF THE CASE

### I. THE '526 PATENT INTRODUCES A REVOLUTIONARY APPROACH TO PATIENT-INFORMATION MANAGEMENT

1. Information is essential to safe and effective health care. Relying on physical records and paper charts, the medical industry previously struggled to maintain the vast information necessary for clinical decisions and patient management. Physical "flowcharts" were limited to a single location. Those charts were not interactive or searchable, were sometimes illegible, and could be inadvertently destroyed. Nor could physical charts automatically collect and record data from machines or laboratories, risking devastating transcription errors. Physical tracking was familiar but fell below optimal service and performance. A68(1:14-29).

The industry responded with automated solutions—general-purpose databases or rigid patient-information databases—but these also suffered serious drawbacks. General-purpose databases were not tailored to the medical environment. Their format was unfamiliar to industry professionals and lacked industry-specific

tools and schemes. Rigid databases, by contrast, accommodated the health-care industry, but lacked flexibility for different services and specialties (*e.g.*, pediatrics, radiology, obstetrics, cardiology), producing a frustrating, one-size-fits-all approach. Worse still, this model's rigidity left entities unable to *record* all information essential for responsible care. If a critical category was omitted from a database, users would ignore it entirely (an untenable option) or track it manually (an inconvenient, costly alternative). A68(1:30-63).

2. The inventors of U.S. Patent No. 5,682,526 ('526 patent) solved these problems. Using an elegant system of structured data and linking functionality, the patentees devised an ordered method for recording and displaying patient information, letting users flexibly organize electronic health records (EHRs) without reprogramming underlying data structures. Users could finally "optimize[]" software "for the structure and procedures of…particular health care organization[s]." A68(1:66-2:9).

A preferred embodiment depicts a "patient information hierarchy, which defines and organizes the information that may be stored about each patient" (A68(2:1-5)):

4



**FIG. 3**

These hierarchies include categories ("parameters"), subcategories ("result values"), and linking between categories and subcategories. "Parameters" (*e.g.*, "x-ray") represent "pieces of patient information," such as "administrative information," "indications of patient condition, laboratory test results, assessments, and the administration of treatments." A68(1:23-29). "Result values" (*e.g.*, "x-ray *for the knee*"; radiation levels), in turn, reflect specific patient data corresponding to a parameter. Those result values are subsequently linked to other parameters (*e.g.*, "diagnosis"—"osteoarthritis of the knees")—constructing an association between patient data "grouped in a[ny] way that is logical to the users of the patient information systems." A68(2:17-20), A69(4:64-65).

The specification further depicts how parameters can be defined and organized into a "parameter definition table" (A50):

5

| parameter id | parameter name | linked from parameter | parameter data type | normal value | data type - specific information |
|---|---|---|---|---|---|
| | | 401 | 402 | 403 | 404 | 405 | 406 |
| 10001 | cough | yes | select | none | none non-productive productive     10013, 10014 |
| 10002 | respiration | no | select | normal | normal heavy shallow |
| 10003 | chest sounds | no | select | none | none soft loud |
| 10004 | sleep | no | select | | awake asleep |
| 10005 | Demerol | no | encapsulating | | *10007, 10008, 1009 |
| 10006 | Amoxicillin | no | encapsulating | | *10010, 10011, 10012 |
| 10007 | dose | no | integer | | |
| 10008 | dose units | no | select | cc | mg cc |
| 10009 | route | no | select | intravenous | oral intravenous |
| 10010 | dose | no | integer | | |
| 10011 | dose units | no | select | mg | mg cc |
| 10012 | route | no | select | oral | oral intravenous |
| 10013 | sputum color | no | select | | white yellow green |
| 10014 | sputum amount | no | select | | white yellow green |
| ⋮ | | | | | |

parameter definition table    400

*FIG. 4*

Thus, for example, a parameter, "cough," may have possible result values of "none" (patient did not cough), "non-productive" (patient coughed without sputum), or "productive" (patient coughed with sputum). The latter result value ("productive") is thus linked to other parameters—such as "sputum color" and "sputum amount." A50. This permits separately storing data in a structured format while linking items for joint association and display as necessary.

This functionality advances critical medical objectives. For example, linking enables the system to craft automated alerts using patient data. When patients are prescribed medication, the system can accept a particular dosage ("result value" of

6

"dose" parameter), link it to a patient's weight (a distinct "parameter"), and prompt users to adjust dosages that exceed acceptable weight-based dosing. Identical methodologies may avoid drug-drug, drug-allergy, drug-disease, and other contra-indications. A3351-A3352.

Claim 1, the principal claim at issue, articulates the claimed method's core functionality:

> A method in a computer system for designing, under the control of a user, a patient information hierarchy, the hierarchy containing a plurality of parameters, including a linked-from parameter having a linked-from possible result value that is linked to one or more linked-to parameters, the method comprising the steps of:
>
> (a) receiving an instruction from the user to create a new parameter within the patient information hierarchy;
>
> (b) in response to step (a), creating a new parameter within the patient information hierarchy;
>
> (c) receiving an instruction from the user to specify a plurality of indicated possible result values for the new parameter;
>
> (d) in response to step (c), specifying the indicated possible result values as possible result values of the new parameter;
>
> (e) receiving an instruction from the user to link an indicated linked-from possible result value among the possible result values of the new parameter to one or more indicated linked-to parameters contained within the patient information hierarchy; and
>
> (f) in response to step (e), within the patient information hierarchy, linking the indicated linked-from possible result value to the indicated linked-to parameters, such that the new parameter is a linked-from parameter, and such that, when the new parameter is dis-

> played for a particular patient, if the new parameter
> has the linked-from possible result value, the linked-to
> parameters are displayed in conjunction with the new
> parameter.

A73-A74(12:41-13:2).

The claim's ordered steps inevitably require sequential performance. Using simple logic, it is impossible to specify a parameter's result values until that parameter exists, and it is impossible to link together a "possible result value" and a "linked-to parameter" until *those* items exist. Claim 1 is thus capable of being performed, if at all, in chronological order.[1]

## II.   STATUTORY AND REGULATORY FRAMEWORK

1.   Congress recognized the critical nature of patient-information management in the Health Information Technology for Economic and Clinical Health Act (HITECH), enacted with the American Recovery and Reinvestment Act of 2009. Pub. L. No. 111-5, div. A, tit. XIII, § 13001(a), 123 Stat. 115, 228 (2009). HITECH established an "Office of the National Coordinator for Health Information Technology"—lodged within the U.S. Department of Health and Human Services—and tasked the Secretary with promulgating regulations to "devel-

---

[1] The patent also claims novel methods of customizing electronic "flowsheets" for things like "entering and displaying result values…for particular patients." A68(2:12-14). While Uniloc preserved indirect-infringement counts concerning other claims, the district court's rationale focused effectively on claim 1, rendering that claim alone pertinent on appeal.

op[]…a nationwide health information technology infrastructure that allows for the electronic use and exchange of information." 42 U.S.C. § 300jj-11(a)-(b).

HITECH's objectives included "improv[ing] health[-]care quality, re-duc[ing] medical errors, reduc[ing] health disparities," and "provid[ing] appropri-ate information to help guide medical decisions at the time and place of care." *Id.* § 300jj-11(b)(2), (4). It charged the Coordinator with endorsing "standard[s]" and "certification criterion" for "qualified electronic health record[s]"—those "in-clud[ing] patient demographic and clinical health information, such as medical his-tory and problem lists," and with "capacity" to "provide clinical decision support," "support physician order entry," "capture and query information relevant to health[-]care quality," and "exchange electronic health information with, and inte-grate such information from[,] other sources." *Id.* §§ 300jj(13), 300jj-11(c)(1), 300jj-14. Products and entities achieving certification qualify for substantial feder-al subsidies. *Id.* § 300jj-31.

2. The Secretary promulgated regulations under HITECH for "testing and certif[ying]" patient-information-management software. 45 C.F.R. § 170.300(a). Those regulations required systems to perform multiple tasks, including "*drug-drug, drug-allergy interaction checks*"—"[a]utomatically and electronically gen-erat[ing] and indicat[ing,] in real-time, notifications at the point of care for drug-drug and drug-allergy contraindications based on medication list, medication aller-

gy list, and computerized provider order entry"; "*[m]aintain[ing] up-to-date prob-lem list*"—"enabl[ing] a user to electronically record, modify, and retrieve a pa-tient's problem list for longitudinal care"; "*[m]aintain[ing] active medication list[s]*"; "*[m]aintain[ing] active medication allergy list[s]*"; and "*[i]ncorporat[ing] laboratory test results*" "in a structured format," including "[e]lectronically attribut[ing], associat[ing], or link[ing] a laboratory test result to a laboratory order or patient record." *Id.* § 170.302(a)-(h). In specific settings, the regulations also required "*clinical decision support*"—"[i]mplement[ing] automat-ed, electronic clinical decision support rules (in addition to drug-drug and drug-allergy contraindication checking) based on the data elements included in: problem list; medication list; demographics; and laboratory test results." *Id.* § 170.304(e).

To achieve these functional objectives, a "Complete EHR system"—one cer-tified to meet all mandatory criteria—must organize patient data into structured documents, which are subsequently linked to conform to predefined operative standards. (Systems, for example, cannot successfully cross-check "medication lists" against "problem lists" *without* linking.) That structure automatically embod-ies a patient information hierarchy.

Vendors seeking certification must demonstrate compliance with federal cri-teria during official testing. The Secretary designated certain "organization[s]"—called "*ONC-Authorized Testing and Certification Bod[ies]*"—to conduct "testing

and certification" under these provisions. 45 C.F.R. § 170.402; *id.* § 170.502.

These entities must "test and certify" applicants to "all applicable certification criteria adopted by the Secretary." *Id.* § 170.445(a); *id.* § 170.545(a).

## III. DEFENDANTS' SOFTWARE OBTAINS "COMPLETE EHR" CERTIFICATION UNDER FEDERAL REGULATIONS

Defendants certified their software with the Certification Commission for Health Information Technology (CCHIT). CCHIT is an authorized testing body; its official certification qualifies software for HITECH's economic subsidies. A3022. CCHIT's "inspection process is based on real-life medical scenarios designed to test products rigorously against the complex needs of health[-]care providers." A3078. Testing is verified at "live sites" and consists of a "closely defined series of test steps to be executed by the applicant." A3046, A3078. These ordered steps are conducted "consecutively" unless an applicant seeks an "advance" variance. A3098. (Neither ECW or Pulse sought or obtained a variance.)

CCHIT's test script requires applicants to create real-time structured records for multiple "invented" patients, whose detailed information (including "patient IDs") are assigned and recorded at the test's outset, and supplemented during the procedure. *E.g.*, A3100 (requiring a "patient chart [for "Joe Gardner"] created at login"); A3102-A3103 (requiring "[t]he system…to capture structured data in the patient history" and "capture, maintain and display, as discrete data, lists of medications and other agents to which patient has had an allergic…reaction"). The test-

ing procedures direct a specific sequence of ordered steps, including certain preparatory steps for later scenarios. *E.g.*, A3116 (explaining in "Comments" that "[n]o criterion is listed here, as this order is entered in preparation for a subsequent step"). Testing scenarios require software to perform tasks such as drug-drug and drug-allergy checks, maintaining active medication and allergy lists (including discrete lists showing allergy symptoms), and linking medical procedures to diagnoses. A3353.

For example, the test script includes one scenario where an infant patient, Will Haynes, is prescribed Amoxicillin for an ear infection, using ordered steps:

| Step | "Procedure" | "Expected Result" | "Criteria and Reference" |
|------|-------------|-------------------|--------------------------|
| 1.61 | "Enter today's weight for Will Haynes (9.5 kilograms) and temperature of 104 degrees." | "Patient weight and temperature entered." | "The system shall capture patient growth parameters…*as discrete elements of structured data*." |
| 1.62 | "Will has an ear infection; enter prescription for Amoxicillin 250 mg/5ml, 15ml, 4 times a day." | "System alerts that dosage is incorrect based on the patient weight. Do not complete the prescription." | "The system shall, when a maximum individual or daily dose exist, alert the provider when weight-based or BSA-based dosing would cause these to be exceeded." |
| 1.63 | "Display dose calculator for patient specific dosing based on weight. "For Amoxicillin prescription the dose-per-weight is 80 mg/kg and the patient weight is 9.5 kg (*entered previously*)." | "Dose calculator displays. Patient weight (9.5 kilograms) entered at step 1.61 is used in calculation, either automatically or through repeated input by the user." | "The system shall provide weight-based dosing when doses based on weight (e.g. mg/kg) are available for a medication." |
| 1.64 | "Prescription for Amoxicillin is created | "Prescription is created and is associated with the prob- | "The system shall provide the ability to *associate* orders, med- |

12

| | | |
|---|---|---|
| to make up the dose at 250 mg/5ML.<br><br>"Sig will be one teaspoon three times per day for 10 days.<br><br>"Associate prescription with problem 'right otitis media.' *The problem must be captured as discrete data.*<br><br>"Medication information must be stored as discrete data; at a minimum, there must be one field for each of the following:<br>1. Medication name, form and strength;<br>2. Dispense quantity;<br>3. Refills; and<br>4. Sig." | lem 'right otitis media'; the problem is captured as discrete data.<br><br>"Medication information must be stored as discrete data…." | ications, and notes with one or more problems/diagnoses.<br><br>"The system shall provide the ability to capture and maintain, *as discrete data*, a diagnosis/problem code or description associated with an order…." |

A3118-A3120 (emphases added; immaterial notes removed).

Consequently, systems must create parameters for medication (Amoxicillin) and dose; specify the "dosage" result value for the dose parameter; link that result value to Will's weight; and activate an alert, based on the dosage-weight link, that dosage exceeds permissible weight-based dosing—with that link reestablished once correct dosing is entered. Without properly capturing discrete data and employing linking functionality, systems cannot sequentially accomplish these ordered steps.

Defendants obtained "Complete EHR" certification, including certification in "Child Health." A3229-A3230 (Pulse); A3688 (ECW). This certification dramatically increased the value of Defendants' software: once certified, Defendants' software qualified for federal subsidies; anyone operating the software in compliance with HITECH's standards was eligible for substantial federal funds. The average per-customer subsidy is $40,000 to $60,000, and approximately 18,000 ECW customers (for example) have obtained federal funding via certification. A4897.

## IV. LITIGATION AND PROCEEDINGS BELOW

1. Uniloc filed this action as two complaints that were later consolidated. A29-A30. ECW and Pulse were each sued for directly and indirectly infringing multiple claims of the '526 patent. A103-A114; A149-A159.[2]

Uniloc introduced evidence and expert testimony that Defendants infringed in multiple ways. Defendants designed and embedded a patient-information hierarchy into their software. A4888. A detailed examination of Defendants' source code revealed that Defendants' software, predictably, embodied the full functionality necessary for sequentially practicing the claimed method (including creating pa-

---

[2] These complaints were consolidated with an original suit by Medsquire, LLC, that was ultimately dismissed (voluntarily) for lack of standing. A29-A30. The orders from that original action, including the *Markman* order, were deemed binding on these consolidated actions. *Ibid.* There is no dispute that Uniloc, as the complete owner by assignment of all rights in the patent, is a proper plaintiff with standing to assert these claims. A104; A150.

14

rameters, specifying possible result values, and linking). *E.g.*, A3990, A4124, A4145, A4150, A4154-A4155; A3751-A3755, A3830, A3880-A3882. That functionality was confirmed by screen shots, which again showed the ordered practice of the claimed method. *E.g.*, A3996, A4126, A4131-A4134, A4138, A4141, A4144, A4146-A4147, A4158-A4159; A3765, A3893.

Even Defendants' instruction manuals specifically taught the full patented functionality. *E.g.*, A4127-A4129, A4143, A4152-A4153, A4156; A3872-A3874. While each step was not necessarily taught together as a unit, the last ordered steps inevitably relied upon teaching and performing the preceding steps: according to the evidence above, the linking instructions *presumed* the existence of parameters and result values, and it was unnecessary to *reiterate* earlier teachings on those subjects before teaching linking functionality.

Defendants also practiced the method steps during internal testing. Each Defendant admitted vigorously interrogating their software's full functionality before its commercial release. Pulse admitted running "test patients…through the gauntlet" (A3013), and ECW admitted performing "regression testing" (A3422), which extensively probes the entirety of the software's capabilities. While this internal testing did not involve real patients, it did use data from "invented" patients: Pulse confirmed using "Mickey Mouse," "Donald Duck," and others (A2949); ECW

confirmed using "patient" "T Templates" (A3424). Neither Defendant explained how this rigorous, "regression" testing omitted any step of the claimed method.[3]

Finally, Uniloc introduced the full CCHIT test script—together with expert analysis (A4217-A4225)—showing that Defendants infringed during the CCHIT demonstration: because federal standards required practicing the claimed methods, Defendants could not have obtained certification without infringing. *E.g.*, A4057 (CCHIT's "test script shows that the dosage (Result value of a linked-from parameter) of a medication is linked to the weight (linked-to parameter) of the patient."), A4066 ("The dosage (linked-from parameter) of Two puffs (Result value) of 'Proventil' is recommended for 'wheezing' (Linked-to parameter)."), A4150, A4154, A4219, A4224.

2.  The district court engaged in formal claim construction. Its *Markman* order construed "patient information hierarchy" as "[a]n organization of information related to a patient that is arranged into categories and one or more subcategories." A33. The court refused to read "hierarchy" as necessarily implying formal structures or "ranking." The intrinsic evidence instead reaffirmed the patent's flexibil-

---

[3] Uniloc sought copies of Defendants' test scripts, but Defendants refused to provide them. The district court declared Uniloc's request untimely under the discovery-dispute deadline, and accordingly refused to order the production. A7-A10.

ity, with categories or subcategories "group[ed]" in any fashion "'logical to the us-er.'" A34.

The court also rejected Defendants' efforts to read "Figures 3, 4, and 5 in the specification" as "exclusive embodiments" of particular claims. A34. Those figures were "preferred embodiments," not claim "limitations." A35.

The court also construed "parameter" as "piece of patient information" and "result value" as "data relating to a patient," rejecting Defendants' effort to limit that phrase to "observable or measurable data." A36-A37, A43.

Finally, as relevant here, the court rejected Defendants' argument that the term "user" was exclusively a "health care provider at the point of care." A43-A44. Instead, the intrinsic evidence confirmed that "users" could be anyone, including programmers or consultants hired to construct a patient-information hierarchy "in a specific way to meet [a health-care] provider's needs." *Ibid.*

In its *Markman* ruling, the court never asked or addressed whether claim 1's preamble was limiting or had any particular definition expanding or contracting the scope of claim 1's actual steps.

3. Defendants moved for summary judgment of non-infringement and inva-lidity. After briefing, the court held a hearing and subsequently granted summary judgment of non-infringement.

First, the court held that "Defendants' production and sale of software" did not directly infringe, since claim 1 was a *method* claim: an infringer must "perform each step of the patented method," which is not possible merely by selling or making software. A4-A5. In so holding, the court never addressed Uniloc's actual argument based on Defendants' *use* of software: claim 1 involves active steps that are self-contained within the software itself. The court never explained how (i) Defendants constructed the initial patient-information hierarchy without practicing the method; or (ii) the software's "use," post-sale, did not infringe, even though the software itself performed every claimed step upon activation.

Second, the court held that Defendants' internal testing did not directly infringe. Claim 1 implicated a method with sequential steps. But the evidence, the court reasoned, did not show *sequential* performance in internal testing, but merely "isolated" practice of the claimed steps. The court never explained how Defendants extensively tested the software's linking or alert functionality without *first* creating parameters and result values—and thus sequentially performing the ordered steps. A10-A11. In addition, the court asserted that claim 1 required "real or invented" patients, and Defendants' random testing did not meet that "general patient requirement." A11. In explaining its conclusion, the court never confronted that claim 1, textually, has *no* "patient" requirement—as confirmed immediately by claim 3's *specific* "patient" requirement. Nor did the court confront Defendants'

*concessions* of using "invented" patients, such as "Mickey Mouse, Donald Duck," and "T Templates."

Third, the court endorsed Defendants' argument, pressed briefly at the tail-end of each motion, that CCHIT's test scripts did not *require* infringement. Defendants never explained how compliance was possible *without* infringing, but they rested exclusively on Uniloc's purported lack of proof. The district court likewise faulted Uniloc's expert for purportedly citing CCHIT's procedures "out of order," together with other reasons (mostly raised *sua sponte*) that satisfying those procedures did "not necessarily result in direct infringement." A13-A20. In so holding, the court never explained how CCHIT's ordered procedures were possibly satisfied *without* sequentially performing the claimed steps.

Finally, the court rejected Uniloc's theory of indirect infringement: while Defendants' user manuals instructed clients to practice each step independently, those "isolated" instructions were insufficient to support any predicate act of direct infringement. A20-A21. The court again refused to explain how anyone might perform claim 1's final steps without practicing its earlier steps. Moreover, the court rejected Uniloc's widespread circumstantial evidence as proving only "infringing capability": circumstantial evidence is insufficient for method claims, the court held, because it cannot prove "the codes were *necessarily* invoked or executed by any[one]." A21-A22.

After granting summary judgment of non-infringement, the court dismissed Defendants' invalidity defense as moot. This appeal followed.

## SUMMARY OF ARGUMENT

Contrary to the court's holding, Uniloc established multiple theories of direct and indirect infringement. The court's analysis is out of step with circuit law, cannot account for clear record evidence (which must be construed in *Uniloc's* favor), and misreads claim 1 in a way that conflicts with its plain text, the surrounding claims, the specification, and the preferred embodiments. The judgment of non-infringement should be reversed.

1. A. In rejecting Uniloc's internal-testing theory, the court held that Uniloc somehow failed to present *any* evidence (direct or circumstantial) of Defendants' sequential performance of the claimed steps. According to the court—acting against Rule 56's exacting standard—all of Uniloc's evidence was merely *hypothetical*: while Defendants' software *could* be used to meet every claimed operation, Uniloc had not actually shown that Defendants chronologically practiced the claimed steps. The internal-testing evidence, according to the court, merely reflected "isolated" performance of the method steps, rather than the required proof of chronological steps performed *sequentially*.

Yet each Defendant unequivocally confirmed that it exhaustively tested its software's functionality before putting it on the market. Each Defendants' software

also reflects the undeniable existence of a hierarchical scheme for processing structured data—and doing so exactly by linking categories and subcategories ("parameters" and "result values") to other categories ("linked-to parameters"), and providing users the ability to replicate that pre-existing functionality to create and link new categories and subcategories. Without this basic functionality, Defendants' software could not possibly generate notifications like the "drug-drug and drug-allergy contraindications" that are required by federal certification standards. *E.g.*, 45 C.F.R. § 170.302(a). Uniloc established these facts with expert testimony, Defendants' source code, evidence of the software's functionality, and Defendants' own direct admissions.

If Defendants found a way to mimic claim 1's functionality without performing its sequential steps, Defendants surely would have little trouble establishing that fact. They could have pointed out their own source code, produced their own testing scripts, identified their own user instructions, and illustrated their unique procedure for creating (for example) drug-allergy alerts, using structured data, without employing any linking functionality at all. Had any of this been possible, one would expect Defendants to volunteer the information that is uniquely in their possession. Yet Defendants offered—nothing. Uniloc established a firm case on multiple fronts that Defendants infringed. Defendants' inability to controvert this evidence is sufficient for denying summary judgment on this ground.

The court separately rejected Uniloc's internal-testing theory on the basis that claim 1 must be practiced with a "patient, real or invented," and Uniloc failed to satisfy this "general patient requirement." A11. If claim 1 requires *any* "patient" at all, the claim was amply satisfied by *Defendants'* own evidence: Pulse conceded that it used "Mickey Mouse" and "Donald Duck" (among others), and ECW conceded that it used "patient" "T Templates" when interrogating its software's complete functionality. Thus, if any patient, real or otherwise, satisfies claim 1, the court's analysis fails under its own terms.

And the court's terms were wrong: claim 1 unequivocally permits crafting a patient-information hierarchy *without* any patients. When the patentees wished to require data for particular patients, they said exactly that—as they *expressly* provided in neighboring claims. The court's analysis is irreconcilable with the intrinsic evidence, and it would improperly introduce a claim limitation that does not exist. Uniloc established a viable theory based on internal testing, and the court's contrary judgment should be reversed.

B. Ample evidence supports Uniloc's theory that Defendants could not possibly obtain CCHIT certification without performing claim 1's ordered steps. Where the steps of a standard replicate the steps of a method, a patentee can prove direct infringement by establishing compliance with the standard itself—certification is a perfect proxy for infringement. Because multiple CCHIT testing

22

scenarios require the sequential performance of the claimed steps, each Defendant directly infringed multiple times in obtaining certification.

The court held otherwise by focusing on a single CCHIT testing scenario (which it misread), ignoring the others, misconstruing Uniloc's expert report, and invoking a series of flawed issues barely raised (if at all) by Defendants, a procedural irregularity under Rule 56. Worse yet, the court's rationale rested on a logical impossibility—that Defendants' software let users link together two objects before those objects exist. The court's holding was incompatible with circuit law, the patent's elements, and uncontroverted evidence, and it warrants reversal.

C. The court held that Uniloc cannot premise direct infringement on the "manufacture or sale" of a *method* claim. True or not, Uniloc's theory was not premised on "manufacture or sale," but "*use*" (35 U.S.C. § 271(a)).

First, Defendants embedded the claimed steps in their software, and thus the software itself reflects Defendants' own use of claim 1 (in constructing the default patient information hierarchy). Uniloc's theory is not that the software *exists*, but rather that it reflects Defendants' prior *use* in actively performing the claimed method. *Cf. Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 628 (2008) ("patented method[s]…may be 'embodied' in a product").

Second, Defendants' software is fully self-contained; the software automatically performs each of the claimed operations. Any downstream alterations to the

existing "hierarchy" are the direct result of the software's (self-effectuating) *use* of the claimed methods in its ordinary operation. Because the software "dictates the performance" of the infringing steps, and "automatically perform[s] the disputed steps of the [method] claims," only Defendants' "actions are involved in" practicing claim 1. *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) (upholding direct infringement by a manufacturer that "designed and built" the accused "chip and software," even after customers had the software). The manufacturer is responsible for its inherent functionality and remains the entity "performing" the steps. That is sufficient under circuit law to prove direct infringement.

2. The court rejected Uniloc's indirect-infringement claim for supposedly failing to identify a *single* act of direct infringement among thousands of end-users employing Defendants' software on a daily basis. The court's cramped view of circumstantial evidence is directly at odds with circuit law.

Uniloc offered compelling evidence that end-users *must* have used the software to infringe because that is exactly how the software was designed to operate. The court should have acknowledged the software's capabilities, its deliberate design, its ordinary usage, the manufacturers' instructions, and the *lack* of any reason to doubt that each customer used the software in the manner intended. Unless customers bought the software to leave it in a box, a rational juror could easily infer

infringement. Yet, according to the court, Uniloc's lack of direct proof left only an insufficient "*possibility*" of infringement.

That holding is out of step with this Court's treatment of circumstantial evidence: it has always been enough, until now, to provide a basis for jurors to draw rational conclusions supporting infringement, even if no direct evidence exists. It is perfectly rational to infer that customers used the software and its core features, and did not simply turn it on and ignore all but a fraction of its functionality. The court's contrary conclusion—in a situation involving *thousands* of users and supposedly not a *single* act of infringement—is implausible and wrongly invades the jury's constitutional fact-finding prerogative.

Finally, Defendants' user manuals readily confirm the predictability of infringing conduct. The court downplayed these manuals on the ground that each step was supposedly taught in "isolation," not immediately together as a unit. But that reflects a fundamental misunderstanding of the claimed steps and underlying law. It is impossible for any customer to perform the last steps *without* performing the earlier steps, and any intervening steps are irrelevant under controlling precedent. These are not some unconnected steps that customers might combine using their own ingenuity. These steps *necessarily* work together; the fact that Defendants did not reiterate each earlier step when articulating the final one does not im-

munize Defendants from liability. The judgment of non-infringement should be reversed.

## STANDARD OF REVIEW

This Court "reviews a district court's grant of summary judgment without deference, reapplying the same standard as the district court." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed. Cir. 2008); *see also Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1361-62 (Fed. Cir. 2013) (applying Ninth Circuit regional law). "The court must afford all reasonable inferences and construe the evidence in the light most favorable to the non-moving party." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1323 (Fed. Cir. 2009); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("weighing of the evidence" and "drawing…legitimate inferences from the facts" are "jury functions").

Summary judgment is inappropriate unless, "drawing all reasonable factual inferences" in the non-movant's favor, "the evidence is such that the nonmovant cannot prevail." *Optium Corp. v. Encore Corp.*, 603 F.3d 1313, 1319 (Fed. Cir. 2010).

**ARGUMENT**

I. **BECAUSE UNILOC PRESENTED COMPELLING EVIDENCE OF THREE SEPARATE THEORIES OF DIRECT INFRINGEMENT, THE DISTRICT COURT WRONGLY GRANTED SUMMARY JUDGMENT**

"To infringe a method claim, a person must have practiced all steps of the claimed method." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009). Uniloc submitted three compelling theories of direct infringement that independently proved Defendants performed every sequential step of the claimed method. For multiple reasons, the court erred in removing this issue from the jury. *Osram Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698, 705-06 (Fed. Cir. 2012).

A. **The Court's Decision On Internal Testing Reflects Multiple Errors Of Law And Logic**

Each Defendant sequentially practiced the claimed steps via internal testing, and the court's contrary conclusion was mistaken.

1. **Uniloc's Evidence Of Internal Testing Readily Confirms That Defendants Actually (Not *Hypothetically*) Performed Every Ordered Step Of Claim 1, And The Court's Contrary Conclusion Is Inconsistent With Circuit Law**

Defendants' internal testing proves direct infringement because the software necessarily infringes in its ordinary operation. Defendants cannot test their software's linking functionality without *first* creating the elements to be linked. The court suggested otherwise (without explanation), but this logical progression pre-

cludes any "isolated" testing:  it is simply impossible to link together two items *before* they exist. Defendants' internal testing cannot interrogate the linking functionality without first satisfying claim 1's steps in their recited order.

A. The factual predicates of Uniloc's internal-testing theory are undisputed and indisputable. ECW and Pulse each perform testing, as the court confirmed. The court simply misunderstood the extensive nature of that testing—and what it automatically implied about Defendants' sequential performance of the claimed method.

ECW's CEO testified that its software is subject to "regression testing," a procedure that exhaustively interrogates the entirety of software's functionality. A3422. ECW also admitted using imaginary patients—"a patient called T, Templates" (A3424)—and not random "placeholder data" (A11) in conducting its review. Thus, if ECW's software provides options to create parameters, specify possible result values, and link result values to other parameters—as it assuredly does—then those procedures were invoked during its testing. ECW tellingly never suggested otherwise or offered *any* proof that its testing was somehow limited to "isolated" steps. It instead relied on the "absence" of direct evidence confirming what everyone already knows: if any "regression" testing occurred at all, it necessarily performed claim 1's steps in sequential order.

For its part, Pulse's motion briefly suggested that it does not perform testing (an implausible notion for a major software manufacturer), but admitted in virtually the same breath—and sentences later in the *same paragraph*—that its "*testing*" only used fictitious patients. A251. Thus, putting aside whether that saves Pulse (since Pulse thinks "real patients" are required to practice claim 1), Pulse admits that it *engages in testing*. And Pulse's representatives further conceded that its testing is rigorous and its software's functionality is fully executed, using fictitious patients, before release. A3013 ("you will have test patients in our system that we'll run through the gauntlet"). These employees confirmed that Pulse invents a series of patients—"Mickey Mouse, Donald Duck" (A2949)—for its testing. No one suggests these employees misunderstood how Pulse tests its software, and their testimony satisfies Uniloc's minimal burden under Rule 56.

B. The existence of full-blown testing establishes Uniloc's case for direct infringement. As explained previously, it is impossible for Defendants to test the software's linking functionality without first creating parameters, specifying result values, and establishing links—and exactly in that order. Nowhere have Defendants supported the court's unexplained (and inexplicable) conclusion that Defendants could link two objects together before those objects exist. Defendants thus necessarily created things like independent medication and allergy lists for "Mickey Mouse" and "T Templates" to confirm the functionality of their drug-allergy

alert—a tool that inevitably links those independent categories, saved as discrete data, to identify adverse reactions. *See* A3301; A3351-A3354. The same is true when testing the ability to order an x-ray ("parameter") to examine a patient's knee ("result value"), and to link that knee x-ray to a specific diagnosis ("linked-to parameter"). Defendants may have invented different conditions when actually testing these procedures (and others), but what matters is what a reasonable jury could readily infer: given the software's functionality, the inevitable sequence of steps to use that functionality, and the clear showing that Defendants invasively examined their entire software, Defendants practiced the claimed method.

C.  The court erred given what was in the record and *not* in the record. For all of Defendants' efforts to undermine Uniloc's proof, Defendants never attempted to establish that Uniloc was *affirmatively* wrong. Defendants never tried to prove that their systems operate in a counterintuitive, unnatural fashion, where items are linked before they exist or discrete objects work together (as compelled by federal standards) without creating categories (parameters), subcategories (result values), and links between those "discrete" groups. They did not identify any software, source code, functionality, or instructions to support the unexpected as-

sumption that their software operates as advertised without performing claim 1's ordered steps.[4]

That silence was conspicuous. A jury would have every right to infer that Defendants' affirmative evidence was missing precisely because it did not exist— especially when evidence is categorically lacking on such a central issue. If Defendants were serious that their software did not replicate claim 1's sequential method, they would have had no trouble directly refuting Uniloc's contentions. Defendants were uniquely situated to disprove Uniloc's analysis based on *Defendants' personal knowledge of their own software*. Instead, Defendants narrowed their efforts to identifying Uniloc's purported *lack* of evidence. (Indeed, Pulse even said that source code is unintelligible, "tantamount to a foreign language," and somehow unfair to use. A255.) Defendants' position was not that Uniloc was mistaken, but only that Uniloc had not established its case.

Contrary to the court's contention, Defendants' lack of affirmative evidence was indeed "*actual*" evidence. A fair inference from Defendants' failing was that Uniloc's theory was correct and Defendants performed each claimed step as con-

---

[4] Defendants offered an employee affidavit merely declaring, without substance, that Defendants' source code was non-infringing. A2962-A2966. If unsubstantiated assertions constitute "evidence" at all, this assuredly does not *eliminate* any question for a jury given Uniloc's competing evidence. If Defendants' employee had concrete proof to support his contentions, it would not have been difficult for him to offer it.

templated. This is not a situation where Uniloc stood by in silence and pointed the finger at Defendants to *disprove* Uniloc's case. To the contrary, Uniloc identified compelling evidence in source code and the software's functionality. In response, Defendants simply asserted that Uniloc had not shown, definitively, that Defendants practiced the claim's sequential steps—while asserting multiple alternative grounds that the court ignored or rejected. *E.g.*, A3.[5] Defendants' submission was woefully incomplete on the critical points, and that evidentiary gap alone warrants denying Defendants' motion—especially when measured against Rule 56's heightened threshold.

    D. Contrary to the court's contentions, Uniloc never "essentially concede[d]" its internal-testing theory failed without Defendants' "actual test scripts." A7. Uniloc's theory was pressed and passed upon below, and there was no such "concession" anywhere in the record.

---

[5] Defendants, for example, repeatedly insisted that claim 1's "user" must be limited to healthcare professionals at the point of care, a contention found nowhere in the patent's unambiguous text. A43-A44. Defendants and their expert also relied extensively on the view that the claims were limited to features in the preferred embodiments, even though the patent expressly disclaimed any such limitation (A35, A42)—and it would require reading into the claims a multitude of limitations found only in the specification, a cardinal error of claim construction. *See Prima Tek II LLC v. Polypap, SARI*, 412 F.3d 1284, 1289 (Fed. Cir. 2005). The very fact that Defendants' submission focused on these points, rather than articulating their own version of how their software operates, suggests that Defendants had no controverting evidence on that central issue.

At the summary-judgment hearing, Uniloc moved under Fed. R. Civ. P. 56(f) to postpone Defendants' motion until the magistrate judge could resolve a dispute over Defendants' refusal to supply its internal-test scripts. Uniloc requested these scripts because it believed they would reveal what was plain from the mere fact of exhaustive testing: Defendants necessarily created parameters, specified possible result values, and linked those values to new parameters. *See* A4888 (ECW conceding its software could create new parameters).

Despite the issue's obvious materiality, the court held that Uniloc sought to compel the material too late: although Uniloc requested the scripts before discovery closed, it supposedly failed to request those documents with sufficient particularity and sought relief after the discovery deadline elapsed (despite Uniloc's timely efforts to resolve the issue without burdening the court with formal motions). A7-A10. Not only was the court's disposition incorrect, but Defendants' resistance is telling: if those scripts supported Defendants, they presumably would have volunteered the scripts on their own. Those missing scripts thus supply a revealing inference in *Uniloc's* favor, not Defendants'. *Cf. Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1572-73 (Fed. Cir. 1988) (permitting inference that nonproduced material was against party's interests).

In any event, those test scripts were unnecessary to prove Uniloc's case. When a party admits that it rigorously tests ("through the gauntlet") every corner

of its software with "regression" testing, the ordinary inference is that the testing covers the core functionality necessarily present in the software. Rather than disprove this theory with their own evidence, Defendants merely identified purported gaps in Uniloc's case. But it is clear that Defendants performed internal tests, and those tests succeeded only because the software meets each sequential claim limitation. This was sufficient to surpass Rule 56's low threshold, and the court was wrong that *no* rational juror could view this evidence in Uniloc's favor.

E. Notwithstanding this showing, the court rejected Uniloc's internal-testing theory as "analytically flawed." A10. According to the court, a method patent requiring sequential steps is not infringed if those steps are performed in "isolat[ion]." *Ibid.* Because Defendants' "step-by-step" performance was interrupted by intervening steps—or somehow unconnected to earlier steps—Uniloc could not show that Defendants practiced the claimed method via internal testing. A10-A11.

The court's theory is at odds with circuit precedent. It is true that "chronologically dependent steps in a claimed method must be performed sequentially." A6 (citing *E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007)). But the *E-Pass* rule has an essential corollary: "one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device." *A.B. Dick, Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983); *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1271

(Fed. Cir. 1986). While the court referenced this principle (A19), it erred in adopting Defendants' view of the law: at some unknown (and unknowable) point, method steps become too "distant" or "isolated" to constitute *sequential* steps, and that artificial line was somehow crossed in this case. *See* A4899-A4900.

That analysis is wrong. There is no "these-steps-are-too-isolated" exception to the governing principle. *A.B. Dick* says nothing about placing some artificial limit on the excusable number of intervening steps—when parties perform a sequential method to achieve the patented functionality, they cannot evade direct liability simply by adding extra steps. Likewise, *E-Pass* says nothing about imposing any restriction aside from those found in the patent itself: a claim requiring the *sequential* performance of ordered steps must be performed in the specified order, but a party does *exactly that* by performing those steps and executing the claim's functionality—with or without other steps inserted in between. 473 F.3d at 1222. The same conduct achieves the same functionality either way, justifying the same finding of direct infringement.

Nor can any discernible principle dictate when one step would suddenly become too "isolated" from the others. The court's contrary rule is completely unworkable: At what point are steps deemed "isolated"? How many intervening steps are too many? When every intervening step can be ignored without altering any-

thing about the claim's operation, there is no logical reason—much less a legal hook—for shielding a party from direct infringement.

That describes this situation exactly. The method steps in Defendants' software are not "isolated" from each other under any ordinary understanding of that term: claim 1's steps are sequential precisely because later steps are impossible to perform without first performing the earlier steps. It is irrelevant how much time elapses between (*e.g.*) the creation of the initial parameter (steps (a), (b)) and the ultimate display of the linked-to parameter (step (e)). One cannot specify a parameter's possible result values until that parameter is created, and one cannot link possible result values to other parameters until *both* items exist. Intervening steps cannot unwind the logical sequence of claim 1's ordered steps. That means that once Defendants tested any linking functionality, they inevitably had to meet every other claimed step, in order, at an earlier time. Because all of those steps work together exactly as claim 1 intended, there is nothing "isolated" about any of them. If Defendants test the "linking" feature of their software (they do), they inevitably have performed every preceding element of the claimed operation.

Because internal testing shows that Defendants have practiced each sequential element of claim 1, the court erred in entering judgment of non-infringement.

### 2. According To Its Plain Text, Claim 1 Does Not Contain *Any* "Patient" Requirement, And The Court's Contrary Holding Misreads The Patent And Unambiguous Record Evidence

A. The court separately rejected Uniloc's internal-testing theory on the basis that claim 1, at a minimum, requires a "real-world" or "fictitious" patient, and Uniloc purportedly failed to identify evidence that Defendants' testing employed "*any* patient, real or invented." A11.

The court's conclusion is incompatible with the record. Pulse conceded that it ran tests using "Mickey Mouse," and ECW ran tests using "T Templates." Those may not be real patients, but they are "invented" patients, which is all the court said was required. The court's analysis thus fails under its own terms: While claim 1 does not require *any* patient data at all (pp. 37-42, *infra*), it is clear that Defendants in fact used "patient" data. If Defendants wished to read "actual patient" into claim 1's language—which is not what the patentee wrote—they should have pressed for that non-textual limitation during claim construction.

B. In any event, the court's "general patient requirement" (A11) is incorrect. It misreads claim 1's plain terms, is irreconcilable with the patent's other claims, and conflicts with the specification and preferred embodiments.

1. Claim 1 may be practiced without using any patient data at all. That claim contemplates *designing* a patient-information hierarchy, not *employing* that hierarchy for particular patients. This is why the claim focuses on creating parameters,

specifying "*possible* result values" (not *actual* ones), and linking categories to display discrete data "*if*" certain values are met. These steps construct a framework. If the drafters wanted the steps to include a "particular patient" and *actual* "result values" for that patient, claim 1 would have said exactly that.

Indeed, the '526 patent used that very different language in adjacent claims. In claim 3, for example, unlike claim 1, patient-specific information *was* contemplated. The claim required steps "for a particular patient" that included "receiving a result value"—the *actual* one—and contrasted it with "possible result value[s]" in the generic framework:

> The method of claim 1, further including the steps of, *for a particular patient*:
>> displaying the linked-from parameter;
>>
>> *receiving a result value* for the linked-from parameter;
>>
>> determining whether *the received result value* is a linked-from *possible result value*; and
>>
>> in response to determining that the received result value is a linked-from possible result value, displaying each of the linked-to parameters that are linked to the linked-from possible result value.

A74(13:16-26) (emphases added).

This shows that the drafters knew how to include patient-specific information when they wanted. If they intended to impose the identical requirement for claim 1, they would have used that language rather than the materially different

words found in claim 1. *See Aristocrat*, 709 F.3d at 1356-57. The court's logic has no answer for the textual differences between these companion claims.

2. Even claim 1's step (f), the single step that *references* a "particular patient," describes only what happens *when* claim 1's infrastructure is applied to a patient—it does not require any contemporaneous patient at all ("real" or otherwise) to perform the claimed operation. This is why the step is conspicuously framed in the conditional: it only requires the actual *linking* ("linking the indicated linked-from possible result value to the indicated linked-to parameters"), and then describes the *consequences* of satisfying the linking step—"*such that*, *when* the new parameter is displayed for a particular patient, *if* the new parameter has the linked-from possible result value, the linked-to parameters are displayed." A73-A74(12:66-13:2) (emphasis added). In other words, all step (f) requires is a successful act of linking, creating the *capability* to display the linked-to parameter (during its operation) "*if*" a given "*possible* result value" is activated.

This step reinforces that claim 1 is fundamentally about creating and organizing the underlying "patient information hierarchy," not populating patient data. Nowhere does claim 1 suggest that a party using these ordered steps to construct that infrastructure escapes liability simply because patient-specific information (real or invented) has not yet been processed or stored into the hierarchy.

39

3. The view that a *"patient"* is required to practice claim 1 is also incompatible with the patent's overall structure and scheme.

While the hierarchy may be constructed during patient care, it may also be constructed without patients *in advance* (including by programmers as "users" (A43-A44). This is why the specification discusses the invention as "optimiz[ing]" the hierarchy for "the structure and procedures of the particular health care organization," and describes a "preferred embodiment" as "defin[ing] and organiz[ing] the information that *may be stored*[—not that "*is*" stored—]about each patient." A68(2:3-5) (emphasis added). While these concepts also enable customization at the time of care, the emphasis on structure and procedures at the *entity* level—all to organize a scheme for storing patient information—confirms that the hierarchy may operate independently from its *use* for particular patients.

Consistent with this text, the figures in the patent further demonstrate that the patient-information hierarchy turns on the organizational structure, even before any patient-specific information is added. Figure 3 is "a diagram showing the patient information hierarchy," and it does so by illustrating parameters and result values *without* any actual data for specific patients. Likewise, figure 4 illustrates a parameter-definition table, which defines parameters by showing *possible* result values and corresponding linked-to parameters, again without any patient-specific data. These figures are self-contained and meaningful, despite not a single patient

appearing anywhere in the drawings; they reflect precisely how a flexible, efficient

patient-information hierarchy may be constructed even before any use with actual

patients.

The very concept of *advance* set-up disproves any "general patient require-

ment": if a user may perform claim 1's method steps before seeing patients, then

patients must not be necessary to claim 1. Indeed, the fact that the patent contem-

plates a flexible concept of "user"—sweeping in programmers and others *removed*

*from the point of care*—confirms the separation between building the hierarchy

and deploying it in practice. Because the hierarchy "defines and organizes the in-

formation that *may* be stored about each patient," Defendants perform the claimed

method by creating the structure in the first place—and there is no need to employ

any "patient" (real or otherwise) in building that critical foundation. Defendants'

contrary view is inconsistent with compelling intrinsic evidence.[6]

Consequently, the court errs in asking whether *any* patient, real or invented,

was used in internal testing. The testing showed that Defendants used the claimed

---

[6] When a doctor, for example, creates a new parameter for a particular patient, claim 1's method steps involve crafting and customizing the hierarchy, *not* necessarily populating it with specific patient data. The latter may happen virtually simultaneously with the former (and is covered in other claims), but claim 1's primary focus is on constructing the infrastructure, not utilizing it. That alone enables efficient "patient information management"; the step of recording specific patient information (involving actual "patients") is not necessary to practice claim 1.

methods to devise a patient-information hierarchy: they created the organizational scheme situated to receive and process patient information, and they did so exactly in the manner contemplated by claim 1. The lack of any patient-specific information has nothing to do with Defendants' practice of every element of the claimed method.

4. This is apparently why *not even Defendants* pressed this "general patient requirement" below. During briefing, Defendants maintained that *certain* claims required the use of a "real patient," but conspicuously *excluded* claim 1 from that list. *See* A4521 (faulting Uniloc's "testing theory" because "at least independent claims 4, 10, and 14 all require an actual patient," without mentioning claim 1); A4501 ("claims 4, 10 and 14 are expressly directed to a *particular patient*").[7] That omission was (presumptively) deliberate. The court overlooked this tacit admission, and imposed extraneous requirements not found in claim 1 but expressly set forth in other claims. This was reversible error, and Uniloc's theories under claim 1 are not barred by some non-existent "patient" requirement.

---

[7] Pulse obliquely references claim 1's "patient information hierarchy" during this discussion, but still draws an important distinction between claim 1 and claims 4, 10, and 14 based on claim 1's lack of focus on "particular patient" data. A4501. While ECW attempted to sweep in claim 1 (for the first time) at the motions hearing, it was forced to immediately "concede" that the requirement was "not as clearcut as the other claims." A4888-A4889.

### B. The Court's Decision Regarding The CCHIT Demonstration Is At Odds With Circuit Law, The Patent's Terms, The Court's Own Claim Construction, And Record Evidence

Contrary to the court's finding (A11-A20), each Defendant directly infringed claim 1 by proving that their software complied with CCHIT standards. "[I]f an accused product operates in accordance with a standard, then comparing the claims to that standard is the same as comparing the claims to the accused product." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327 (Fed. Cir. 2010). It is undisputed that each Defendant executed every ordered procedure of CCHIT's test script, and Uniloc showed that CCHIT's testing includes *multiple* scenarios that each sequentially correspond to the claimed method. Rather than engage these scenarios, the court latched onto a single example from the test script, ignored the others, misunderstood Uniloc's expert report, and offered a series of five reasons (most *sua sponte* and all wrong) why CCHIT testing failed to prove sequential performance of the claimed method. The court's reasoning was flawed, and its judgment should be reversed.

### 1. Defendants Practiced Each And Every Sequential Step By Demonstrating Compliance With CCHIT's Testing Procedures

Based on a proper review of CCHIT's test script—which is evidence apart from any expert report—the CCHIT demonstration meets every limitation of claim 1's sequential steps. CCHIT's test script is organized into various patient-care sce-

43

narios (*e.g.*, "medication-dosage-to-weight," "x-ray-to-diagnosis"), and multiple scenarios require ordered procedures that sequentially correspond to claim 1's ordered steps. Uniloc's expert dutifully cited these CCHIT procedures in his report, and each independently precludes summary judgment.[8]

*A. Medication-Dosage-To-Weight Linking Scenario.* In general, CCHIT procedures 1.62-1.64 address a certification scenario where an infant patient, Will Haynes, must be diagnosed with an ear infection and prescribed Amoxicillin. A3118-A3120 In procedure 1.62, a new parameter "Amoxicillin" is created for Will, and the user subsequently specifies dosage result values for that new parameter: "Medication information must be stored as discrete data; at a minimum, there must be one field for each of the following: (1) medication name, form and strength, (2) dispense quantity, (3) refills, and (4) Sig [written material for prescription's label]." A3119-A3120. This requires the system to record, for example, result values of "form and strength" ("250 mg/5ml") and "Sig," reflecting dosage and dispense quantities of "one teaspoon four times per day for 10 days" for the new "Amoxicillin" parameter.

In procedure 1.63, the software must prompt an alert showing that the dosage is incorrect given the patient's weight, which was "previously entered" during

---

[8] Even ECW would only commit to challenging Uniloc by saying that "many"— not *all*—"of the cited tests do not fit together in the sequential order." A297.

the test script. This shows that dosage (result value of a linked-from parameter) was successfully linked to the patient's weight (linked-to parameter), which the system tests against a formula ("the dose-per-weight is 80 mg/kg and the patient weight is 9.5 kg"). In response to the alert, "[t]he system shall provide the ability to display a dose calculator for patient-specific dosing based on weight"—which provides an opportunity to confirm an association between dosage and weight. The user is consequently prompted to adjust Will's dosage (in procedure 1.64) from "*4 times a day*" (a "result parameter") to "*3* times a day for 10 days."

The new information, including the corrected dose, is captured on the actual prescription in procedure 1.64. This "summary" step confirms that the system, chronologically, received and created a new parameter, received and specified possible result values, and received and responded to instructions to link a possible result value (dosage) to a linked-to parameter (weight), with the result displayed in the alert—and later corrected with an updated association between the *correct* dosage and Will's weight. (That linking in procedure 1.63 necessarily occurs *after* the Amoxicillin parameter and result values are created in procedure 1.62—and after the "weight" parameter is created much earlier in the CCHIT test script. Indeed, there would be no way to demonstrate linking if the linked items were not first captured by the system.) This tracks the claimed steps exactly in their sequential order.

*B. X-Ray-To-Diagnosis Linking Scenario.* In general, procedures 4.34-4.35 address a certification scenario where patient Theodore Smith is diagnosed with "osteoarthritis of the knees." A3163. The sequential steps require the user, logged in as "Dr. Butler" (A3148), to demonstrate the ability to create a new x-ray order/procedure ("parameter"), and in turn specify result values of "knee x-ray" and "0.75 mRads of Radiation" for that new parameter. A3163; *see also* A3800-A3804, A3807, A3809, A4055-A4057. Next, the script requires the system to demonstrate the ability to associate ("link") particular result values ("knee x-ray") with one or more "problems/diagnoses" ("osteoarthritis of the knees"): the system must receive instructions that "allow association of order with problem" and "shall provide the ability to associate orders, medications, and notes with one or more problems/diagnosis." A3163, A4057-A4065.

This again reflects the sequential performance of claim 1's ordered steps: the new parameter is received and created, result values are received and specified, and a link is created between one result value ("knee x-ray") to a linked-to parameter ("osteoarthritis of the knees")—a final step that necessarily arises *after* all pertinent parameters and result values exist.

*C. Medication-To-Problem/Diagnosis Linking Scenario.* As Uniloc's expert explained, CCHIT's scripts require the system "to link medication (result value of linked-from parameter) with the associated problem (linked-to parameter)."

46

A4056; A4064-A4065 (citing procedures 1.63-64 and 4.35); CooperRep91-92. Once linked, "[t]he system shall provide the ability to display the associated problem or diagnosis (indication) on the printed prescription." A4067.

For example, the user must demonstrate that its software can associate a recommendation of "two puffs of 'Proventil'" (result value of linked-from parameter) for "'wheezing'" (linked-to parameter). A4056 (citing procedure 1.43). This again meets every limitation of claim 1. As Uniloc's expert explained, CCHIT's script mandates "the system [to] categorize[] data in the form of lists," with "Allergy information and adverse reactions…stored as two different lists." A4058. Those parameters and result values are thus necessarily created independently of each other, and CCHIT certification requires the ability to link those lists (saved as discrete data) together. Again, that linking is not possible until the linked objects are received and stored in the hierarchy.

Any of these procedures (and others during CCHIT's expansive testing) is sufficient to show that CCHIT certification is reserved for software that sequentially handles structured data and linking in the claimed order. *See also* A3159. The court demonstrably erred in removing this issue from the jury.

### 2. The Court's Contrary Determination Is Predicated On Multiple Legal And Factual Errors

Notwithstanding Defendants' "undisputed" satisfaction of CCHIT's certification criteria, the court still declared that not a single juror could view the evi-

dence and rationally determine that Defendants directly infringed the claimed method. The court's holding was premised on a series of five legal and factual errors, none of which withstand scrutiny.

A. First, the court is incorrect that the test script never required "subcategories" and thus never required a "patient information hierarchy." A13.

CCHIT's script explicitly required software to create separate, discrete lists including categories (medicine, allergies, weight, etc.), and subcategories (medicine type, specific allergies, dosage, etc.) that easily satisfy the concept of "parameters" and "result values" under claim 1. Moreover, the only way to demonstrate specific testing functionality—*e.g.*, creating populated prescriptions and a variety of medical alerts—was to employ linking between those structured lists saved as discrete data. The court never explained how Defendants possibly accomplished the mandatory tasks in CCHIT's test script without using a patient-information hierarchy, *including subcategories*.

B. Second, the court was wrong that Uniloc failed to show "direct infringement" of claim 1's "preamble" because Uniloc's expert relied on procedures "remote in sequence and unit" from CCHIT's ordered steps. A13.

Initially, the court's entire premise is wrong, because the preamble is *not limiting*—and thus offers nothing to "infringe." The court never construed the preamble during its *Markman* ruling (A31-A45), and nothing in the record suggested

48

claim 1 was limited by independent steps found in the preamble but not found elsewhere in claim 1's *actual* steps. "Generally, the preamble does not limit claims," and thus should "be construed as merely setting forth the [method's] intended purpose." *Allen Eng'g Corp. v. Partell Indus.*, 299 F.3d 1336, 1346-47 (Fed. Cir. 2002). Here, the preamble adds nothing to the claimed process, and merely provides limited, contextual background for the ordered steps. The court, tellingly, never asserted otherwise.

Moreover, any "elements" the court read into the preamble are surely reiterated elsewhere in claim 1. The preamble describes "designing" the patient-information hierarchy by creating parameters, specifying result values, and then linking those possible values to other parameters. That is precisely what steps (a) through (f) already demand. If Uniloc can independently satisfy the claimed steps, it can also satisfy the preamble's (duplicative) summary.

Finally, Uniloc's expert cited multiple procedures in CCHIT's test script that satisfy each and every component found in the preamble (incidentally, for mostly the same reasons that these procedures also satisfy each and every *actual* step of the claimed method). The court insisted otherwise, but the record proves its error. It is irrelevant whether certain scenarios are "remote in sequence and unit" from *other* passages cited to show infringement; it is sufficient that at least *one* scenario represents a self-contained unit practicing the claimed steps in sequential order.

C. Third, the court is mistaken that Uniloc never explained how the "patient information hierarchy" is *user-designed* or how "new parameters" are "created" rather than "select[ed]…from pre-existing lists." A14.

*As for "user-designed"*:  The court again overlooked that the word "design" only appears in the non-limiting preamble. Claim 1 simply does not require some independent "design" apart from what is textually contemplated *by following steps (a) through (f).*

In any event, the court was incorrect that the "hierarchies" at issue were not "designed." Defendants' certified software was not constructed at random. On the contrary, it reflects a clear logical progression that creates categories (parameters), subcategories (result values), and linking—a system that uses discrete data and linking functionality to satisfy federal requirements. Defendants, as users, structured the hierarchy as they wished. It makes no difference whether Defendants "designed" those parameters before initiating CCHIT's protocol; the fact that they could select a preexisting parameter during the CCHIT demonstration only proves that Defendants *created it previously.*

Nor is that system any less "designed" because it was devised to satisfy federal standards or CCHIT directives. By following claim 1's ordered steps, Defendants were able to accommodate structured data in a flexible format to maximize efficiency in EHR software. Claim 1 requires nothing more.

*As for "new parameters"*:  The court says Uniloc failed to show that "new parameters" are "created" (not simply "pre-existing") during CCHIT testing. A14. But that only proves *Uniloc's* point, not Defendants'. Any parameters invoked during the demonstration did not appear out of nowhere. If they existed during CCHIT's testing, Defendants, as the users, "created" them in the past and those parameters were "new" at that time. Any contrary holding reflects a fundamental misunderstanding of claim 1. As previously explained (pp. 37-42), that claim textually draws no distinction between steps performed in advance and steps performed simultaneously with patient examinations, reflecting the flexibility central to the patent's inventive contribution. So long as a hierarchy is constructed in the ordered procedure found in steps (a) through (f), the claim's limitations are met.

In any event, new parameters *were* created during the CCHIT demonstration. For example, by selecting a particular medication ("Proventil"), the user created a parameter for that patient and selected result values for that parameter ("2 puffs every four hours"). Likewise, in procedures 1.62-1.64, by entering the medication ("Amoxicillin") for "Will Haynes," the system created an entirely new structured document having a newly "created" Amoxicillin parameter. Before

those actions, the medication parameter (and its accompanying result values) did

not exist for those patients in the hierarchy.[9]

D. Fourth, acting *sua sponte*, the court asserted that "procedure 1.62 applies

only to Child Health Certification," and declared that "no facts" in the record

showed that Defendants are "so certified, undermining the assumption that either

Defendant completed this procedure." A14.

Leaving aside the propriety of granting summary judgment on an issue nei-

ther party raised, *cf.* Fed. R. Civ. P. 56(f), the court overlooked *indisputable* evi-

dence that each Defendant sought and obtained "Child Health" certifications. In-

deed, the court only had to examine Defendants' own statements: "2011 Pulse

Complete EHR version 2011 is a CCHIT Certified 2011 Ambulatory EHR, *addi-

tionally certified for Child Health*." A3230; A3688 (ECW is CCHIT certified in

"Ambulatory EHR *and Child Health*") (emphases added). And lest there were

doubt, each Defendant also admits achieving "*complete* EHR certification"—a des-

---

[9] This point is especially clear from the creation of "local parameters," where each
instance of the parameter is independent from one another and can have unique
values for different patients. A69(3:34-39). Every time a user is prompted to create
a local parameter, the software has to create the parameter, specify possible result
values, and link those values to other parameters—otherwise Defendants could not
perform the steps of CCHIT's test script. Thus, for example, every time Defend-
ants specify a particular "dosage" of a "dose" parameter for a new medicine, they
have necessarily created a new parameter in the patient-information hierarchy.
(Each medication for each patient must obviously have its own "dose" and "dos-
age.")

ignation confirming their software met federal standards in every certification cat-

egory, including Child Health. *See* 45 C.F.R. § 170.102 ("*Complete EHR* means

EHR technology that has been developed to meet, at a minimum, all applicable

certification criteria…."); A3229 (Pulse); A3688 (ECW).

This evidence conclusively disproves the court's speculation that Defendants

somehow obtained "complete EHR certification" without performing the multiple

procedures outlined in CCHIT's test, including procedures 1.62-1.64.

E. Finally, the court wrongly set aside Uniloc's entire expert report based on

the report's "out of order" examination of procedures 1.62-1.64 (while refusing to

squarely address the report's analysis of CCHIT's *other* ordered scenarios). As ex-

plained previously, those procedures correspond exactly to claim 1's sequential

steps, and the court's contrary view simply misunderstands the expert report.

In this CCHIT testing scenario, "Will Haynes" was prescribed "Amoxicil-

lin" for an ear infection ("right otitis media"). *See* pp. 12-13, *supra*. According to

the court, Uniloc's expert cited *procedure 1.64*—the step entering the final pre-

scription after modifying the dosage for Will's weight—for the *initial* steps ((a)

through (d)) of receiving and creating parameters and result values for the original

prescription. A16-A17. This rendered the report's *later* connection between *proce-

dure 1.63* and step (e)—where an alert is activated because the initial dosage ex-

ceeds weight-based limits, and a user inputs dose-per-weight—impermissibly "out of order." A18.

This reflects a profound misunderstanding of Uniloc's expert report. Procedure 1.64 *verifies* that the software correctly processed *procedures 1.62 and 1.63*. When, for example, the prescription is populated at procedure 1.64 with "data pertaining to the medication name, form, strength, dispense quantity, refills, and sig" (A15), we know that those discrete data elements were received, specified, and linked *during* procedures 1.62 and 1.63—thus confirming that sequential steps (a) through (f) were performed exactly in order. The court confused evidence reflecting that a step *was* performed with the *actual performance* of that step. Indeed, the court's reading demands the logically impossible—software cannot link two items together before those items exist. A correct reading of the expert report confirms both the court's error and the correctness of Uniloc's infringement theory.

Uniloc did not "cite disjointed and disparate steps…to prove direct infringement." A19. Rather, Uniloc's expert showed that Defendants practiced claim 1 by running procedures 1.62-1.64 in the order they appeared. Ample evidence supports Uniloc's submission, and the court erred in removing this fact-based issue (*see Lucent*, 580 F.3d at 1309) from the jury.

**C.    Because Defendants' Software Is Self-Contained And Automatically Performs Every Step Of The Claimed Method, It Directly Infringes The '526 Patent—And The Court's Contrary Holding Conflicts With Circuit Precedent**

According to the court, Uniloc cannot predicate direct infringement "solely" on Defendants' "manufacture or sale" of their software. A5. As the court explained, because claim 1 involves a *method* claim, the "purported infringer [must] perform each step of the patented method," and producing or selling "software does not constitute *performance* of a method." A4-A5. That is true as far as it goes, but it misconstrues Uniloc's infringement contentions. Uniloc established two ways that Defendants "*used*," not merely "made" or "sold," the claimed method. The court erred in resolving these questions on summary judgment.

1. Defendants performed every step of claim 1 in initiating their own software. Each copy of the software, embedding claim 1's complete functionality, reflects Defendants' *prior* use of the claimed operations. As the evidence showed, Defendants crafted the software in a manner that automatically infringes: it is designed, in advance, to implement a patient-information hierarchy by creating parameters (*e.g.*, "allergies"), specifying result values (*e.g.*, types of "allergies"), and linking those allergies to other parameters (*e.g.*, associated reactions/symptoms). The software is intentionally designed to receive and store discrete data, and to link discrete units to perform automatic, preset functions—exactly like the dosage-weight and medicine-allergy alerts tested during CCHIT's procedures. Had De-

fendants not performed the claimed steps to create the hierarchy—by creating new parameters, possible result values, and links—their software would have flunked federal certification standards.

This reveals the court's error in brushing aside Uniloc's theory as a flawed "capacity" argument. A19, A21. Claim 1 may be infringed regardless whether the design of a "patient information hierarchy" occurs before *or* during patient use (or both). That flexibility is one of the virtues of the claimed invention, and claim 1's plain text is not susceptible to any limiting construction: it does not dictate when or why parameters are created, possible result values are specified, or links are established. Defendants performed those steps in initializing the software (and its patient-information hierarchy), and they also performed those steps during testing and when executing the software during its routine operation.

Consequently, it is not that the software is "capable" of directly infringing claim 1 in the future; the software's inherent functionality reflects that the claimed method was sequentially performed in the past: Defendants could not offer software with its existing "capacity" without meeting every claim limitation, in order, when initializing and testing the software's core functionality. That is sufficient to show direct infringement based on the method's *use* in the software's development; subsequent sales create additional opportunities for infringement (see below), but that is unnecessary to establish liability in the first instance. *See Lucent*,

580 F.3d at 1317 (upholding infringement with "one instance" of performing the method).

2. Defendants also infringe based on the software's subsequent *use* after it is sold. Under *SiRF*, Uniloc can show direct infringement even when end-users operate the software: because the software itself directly performs each step automatically, it is irrelevant that someone besides the manufacturer now operates the software. 601 F.3d at 1331. The manufacturer, in effect, is "performing" the claimed steps. *See Ericsson Inc. v. D-Link Sys.*, 2013 U.S. Dist. LEXIS 110585, at \*32-33 (E.D. Tex. Aug. 6, 2013).

a. Claim 1 involves active steps that are self-contained within the software. Once the software is run, it automatically (and inevitably) performs the claimed operations. For example, when doctors submit instructions to create parameters, specify possible result values, and activate links, the software itself does everything—it "practice[s] all steps of the claimed method." *Lucent*, 580 F.3d at 1317.

This issue is thus squarely controlled by *SiRF*. In a case involving the manufacturer of GPS chips and software, this Court rejected the notion that the "end users of the GPS devices" had to be involved to find direct infringement. 601 F.3d at 1329-31. Because the "technology" itself "automatically perform[ed] the disputed steps of the claims at issue," it was "clear that SiRF infringes as its devices and software dictate the performance of the 'processing' and 'representing' steps." *Id.*

at 1331. It thus made no difference that other actors were involved in the operation of the device (*id.* at 1330); all the patent's "steps must take place in the mobile GPS device," and "[o]nce the GPS receiver is enabled and ready to process the data, only SiRF's actions are involved in 'processing' or 'representing' the data." *Id.* at 1330-31.

As in *SiRF*, Defendants directly infringe precisely because their "software dictate[s] the performance of the [method] steps." *Id.* at 1331. The fact that other entities are using the software does not excuse Defendants from embedding claim 1's functionality into the software itself.

b. Nor is there any doubt that claim 1 is "drawn to actions which can be performed and are performed by a single party"—*i.e.*, Defendants acting on their own. *Id.* at 1329. As this Court has explained, when "a user must activate the functions programmed into a piece of software by selecting those options, the user is only activating the means that are already present in the underlying software." *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1205 (Fed. Cir. 2010) (internal quotation marks omitted).

Here, the fact that a user must turn on the software and send an instruction (in order for the program to *receive* that instruction) does not alter anything about claim 1's requirements: in plain terms, claim 1 focuses on the method of *receiving* commands, creating parameters, specifying possible result values, and linking

items—those are the active steps of the claimed method. *See* A73(12:47) ("receiving an instruction from the user"). The software itself contains and executes that functionality, and the user's input (while necessary for the software to "activate the functions programmed into [it]" (*Finjan*, 626 F.3d at 1205)) is not part of the method claim. The user interaction "defines the environment" for practicing the claim; it does not "import[] a method step into [the claimed operation]." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) (internal quotation marks omitted).

Defendants, as manufacturers, are responsible for the software's execution and performance of claim 1's *actual* steps. When users invoke that functionality to practice the claimed operation, Defendants directly infringe the patented method. *See Intellect Wireless, Inc. v. T-Mobile USA, Inc.*, 735 F. Supp. 2d 928, 939 (N.D. Ill. 2010) (a claim may "'contemplat[e]'" the conduct of multiple parties but "explicitly address the conduct only of a single actor").

c. This theory is sound in principle and practice. Defendants have created a product that predictably results in infringement. That infringement results from the software executing each step automatically. Defendants cannot properly create software to practice claimed methods and then evade direct infringement by placing that software in the hands of third parties. *Cf. Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1338 (Fed. Cir. 2008) (per curiam). Such a result would

demand that patentees prove direct infringement by targeting a potentially endless number of end-users, most of which likely have no understanding of the steps occurring inside the software's black box. Here, those end-users would vastly be doctors and hospitals.

Where a software manufacturer provides self-contained functionality to practice a claimed method, the best view of the Patent Act suggests the *manufacturer* is "using" the patented invention. 35 U.S.C. § 271(a). This allocation of liability comports with practical realities and reasonable expectations, and protects patentees and third parties without burdening judicial and other resources with unnecessary litigation. *SiRF*'s holding is consistent with these objectives. Because the court's rationale is out of step with that precedent, the judgment should be reversed.

## II. THE COURT'S SUMMARY JUDGMENT ON INDIRECT INFRINGEMENT IS INCOMPATIBLE WITH CONTROLLING LAW AND IRRECONCILABLE WITH RECORD EVIDENCE

According to the court, not a single rational juror could find indirect infringement on Uniloc's evidence. The court premised its ruling on Uniloc's "failure" to prove any underlying act of direct infringement, "ever," in the course of thousands of doctors and hospitals using Defendants' software. That holding is indefensible on this record and departs from circuit precedent in multiple ways.

A. **Defendants' Software Is Predictably Used To Infringe, And The Court Wrongly Set Aside Uniloc's Showing By Unduly Restricting The Role Of Circumstantial Evidence**

As previously established, the software infringes upon the claimed method in its ordinary operation. In virtually every doctor visit, Defendants' software will access (or supplement) the patient-information hierarchy, insert new parameters and result values, and then link result values to other parameters. Every time a patient is prescribed medicine (dosage-weight linking), reports a new allergy (drug-allergy-interaction linking), or needs an x-ray (order-diagnosis linking), the software executes the sequential steps of claim 1. *See Vita-Mix*, 581 F.3d at 1326 (reversing summary judgment of non-infringement where circumstantial evidence showed the accused product "will *necessarily* infringe under certain circumstances" and evidence supported "the occurrence of those circumstances").

Contrary to the court's holding, this is not merely some "speculative proposition." A21. This is the ordinary, expected, predictable operation of the software, and there is no reason to believe that health-care providers purchase the software to leave it in the box or somehow use it without accessing basic components of its core functionality. And, indeed, for those doctors who demonstrate proper usage (during official certification exams) to obtain federal subsidies, their own actions provide emphatic confirmation that the software is used exactly as intended—and that the method steps are executed, in order, in everyday use.

This accordingly is nothing like cases where there is no reason to believe that anyone might stumble across a certain use that just so happens to be theoretically possible when combining random aspects of a program's functionality. *Contrast E-Pass*, 473 F.3d at 1222. These users perform claim 1's sequential steps, in order, by using the software in its intended operation during common health-care visits. The true question is not whether it is conceivable that some end-user, hypothetically, performed every step of claim 1, but rather whether it is even plausible that some end-user (much less *thousands* of end-users) somehow *avoided* practicing those steps.

The court wrongly brushed aside this evidence as merely addressing "infringing capability." A21. But this evidence does much more than that. Circumstantial evidence warrants the same weight as direct evidence, *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1359 (Fed. Cir. 2012); *Vita-Mix*, 581 F.3d at 1326, and this circumstantial showing was compelling: the software routinely invokes the claimed functionality, and end-users predictably use that functionality (following the user manual's instructions) to accomplish ordinary aims. Even Defendants refused to say that end-users never infringe, instead asserting that the claimed method is not "primarily" how the software is used. A4888. A rational juror would have no difficulty whatsoever drawing an inference from the software's functionality

and intended use to conclude that end-users directly infringed—especially where a *single* act of infringement suffices to prove the claim. *Lucent*, 580 F.3d at 1317.

Nor was the court correct in restricting the role of circumstantial evidence to proving "infringing capability." A19, A21-A22 (assuming, apparently, that circumstantial evidence "only supports a *possibility*" of infringement, a fact relevant only for claims "limited to teaching bare capacity"). There is no basis in law or logic for such a limitation: the point of circumstantial evidence is not to prove a "*possibility*" that Defendants infringed (A19), but to prove *actual infringement*. When Uniloc showed that Defendants' software was widely distributed with infringing functionality, Uniloc was not suggesting mere "capabilities" or "possibilities," but permitting a fact-finder to conclude what *in fact* happened based on probable inferences from known facts. In adopting the contrary holding, the court effectively imposed a "direct-evidence-only" standard for method patents, a rule that extends this Court's precedent far beyond its intended scope. *See Alco Standard Corp. v. Tenn. Valley Auth.*, 808 F.2d 1490, 1503 (Fed. Cir. 1986).

Uniloc was not required to burden countless doctors and hospitals with discovery to supply direct evidence of what was plain from the software's operation alone. *See In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1336 (Fed. Cir. 2012). The court erred in refusing to recognize the obvious fact issues underlying Uniloc's indirect-infringement theory.

### B. Defendants' User Manuals Specifically Instruct Clients How To Perform The Claimed Method, A Fact Confirming The Predictability Of Infringing Use

Contrary to the court's view, Defendants' user manuals did not simply "teach[ their] clients each step of [the] patented method in *isolation*" (A21 (emphasis added)), at least not as that term is understood in this Court's precedent.

As Uniloc's expert confirmed, Defendants specifically instructed how to perform the method steps: passages in the user manuals show exactly how to create new parameters, specify possible result values, and link those result values to other parameters. While that claimed functionality may not be taught immediately together as a discrete unit, any intervening steps are immaterial under circuit law: given the logical ordering of the claimed steps, it is impossible to perform the last steps *without* performing the earlier steps. Thus, contrary to Defendants' contention, even if "one [step] is [taught] in chapter 1, and one is in chapter 5, and one is in chapter 7[,] and one is in chapter 9" (A4898), the step in "chapter 9" *presumes* that the user understood and performed the tasks in the earlier chapters *before* engaging the final steps: one cannot link together two objects before those objects exist. *Cf. E-Pass*, 473 F.3d at 1222 (crediting infringement theory where "the device at issue…was intended to be used in only one way—to practice the infringing method—and that method was explicitly taught by the proffered instructions"). Defendants were wrong to invite the court to declare software non-infringing unless

the initial steps—which the manual necessarily presumes have already occurred—are reiterated immediately before the final step is introduced. *Contrast Mirror Worlds*, 692 F.3d at 1360-61 (examining "separate[]" instructions that are not inevitably connected by inherent functionality).

This reveals the court's error in suggesting the steps were taught in "isolation." A21. This is not a situation where a manual teaches a series of unconnected steps that an end-user might combine on its own initiative to produce an unexpected result. Here, by contrast, there is a deliberate, direct connection between the steps introduced in Defendants' manuals. One method step ineluctably follows from the previous step in the software's ordinary operation, and any intervening passages do not disturb the direct link between those steps. *See Lucent*, 580 F.3d at 1318 (finding infringement on circumstantial evidence that "'accused products'" were "'designed'" to "'practice the claimed invention'" and customers were "'instructed…to use…in an infringing way'").

Defendants successfully instructed users how to practice claim 1's ordered method, and a rational juror could conclude that at least *one* end-user (among *thousands*) followed those instructions in practicing the claim. *Moleculon*, 793 F.2d at 1272. Defendants cannot now evade liability by interposing steps that are irrelevant to the claimed operation. The court's contrary determination misreads *E-Pass*, and its order granting summary judgment of non-infringement should be reversed.

## CONCLUSION

The judgment should be reversed, and the case should be remanded for further proceedings.

Respectfully submitted.

/s/ *Daniel L. Geyser*

James L. Etheridge
ETHERIDGE LAW GROUP
2600 E. Southlake Blvd.,
   Suite 120-324
Southlake, TX  76092
Tel.:  (817) 470-7249
Fax:  (817) 887-5950
*jim@etheridgelaw.com*

Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

Lawrence M. Hadley
   *Principal Attorney*
Alan P. Block
MCKOOL SMITH HENNIGAN, P.C.
865 South Figueroa St., Suite 2900
Los Angeles, CA  90017
Tel.:  (213) 694-1135
Fax:  (213) 694-1234
*lhadley@mckoolsmithhennigan.com*
*ablock@mckoolsmithhennigan.com*

*Counsel for Plaintiffs-Appellants*
*Uniloc Luxembourg S.A. and*
*Uniloc USA, Inc.*

January 17, 2014

Case: 14-1005 CASE PARTICIPANTS ONLY Document: 24 Page: 78 Filed: 01/17/2014

# ADDENDUM

# INDEX TO ADDENDUM

Am. Order Granting Mot. For Summ. J. Of Non-Infring. & Denying As Moot
 Mot. For Summ. J. Of Invalidity, A1-A22 (Aug. 29, 2013) ..................Add. 1

Claim Construction Order, A31-A45 (Feb. 28, 2013)......................................Add. 2

U.S. Patent No. 5,682,526, A46-A77 ..............................................................Add. 3

CASE PARTICIPANTS ONLY Case: 14-1005 Document: 23 Page: 80 Filed: 01/17/2014

# ADDENDUM 1

JS-6

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

9
10
11

| | |
|---|---|
| UNILOC LUXEMBOURG, S.A.; and UNILOC USA, INC.<br><br>     Plaintiffs,<br><br>     v.<br><br>eCLINICALWORKS, LLC; and PULSE SYSTEMS, INC.<br><br>     Defendants. | CASE NO. CV13-3244-MWF (PLAx)<br>CASE NO. CV12-3246-MWF (PLAX)<br><br>AMENDED ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT [35, 37] AND DENYING AS MOOT MOTION FOR SUMMARY JUDGMENT OF INVALIDITY [36] |

12
13
14
15
16
17
18
19
20
21
22
23
24

This patent action is before the Court on three Motions for Summary

25

Judgment filed by Defendants eClinicalWorks, LLC and Pulse Systems, Inc.

(Docket Nos. 35, 36, 37). Pulse Systems and eClinicalWorks separately move for summary judgment of non-infringement (Docket Nos. 35, 37) and jointly move for summary judgment of invalidity of the subject patent (U.S. Patent No. 5,682,526 or the "'526 Patent"). (Docket No. 36). The Court held a hearing on the Motions on August 20, 2013, at with counsel for all parties appeared and offered argument. Having considered the parties' submissions and arguments, the Court GRANTS Defendants' Motions for Summary Judgment of Non-Infringement and DENIES AS MOOT Defendants' Motion for Summary Judgment of Invalidity.

In deciding these Motions under Rule 56, the Court applies *Anderson*, *Celotex*, and their Ninth Circuit progeny. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed. 2d 265 (1986); *In re Oracle Corp. Securities Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case."). The non-moving party may not simply rely on allegations in its pleadings but must identify specific facts raising a genuine dispute that will be material at trial. Fed. R. Civ. P. 56(c).

# I.  MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT [35, 37]

Plaintiffs allege three claims for relief against Defendants for direct patent infringement, indirect patent infringement, and contributory infringement. (Docket No. 1). The Court previously issued a Claim Construction Order in a related case after briefing and argument by all parties. (CV 11-10122-MWF (PLAx), Docket No. 96). For jurisdictional reasons, the related case was dismissed, re-filed as two

cases, and consolidated as the present action (CV 11-10122-MWF (PLAx), Docket No. 134), but the Court's Claim Construction Order remains binding on the parties. (Docket No. 41-15).

*"User":* Defendants expend significant energy trying to re-litigate the Court's   previous construction of the term "user" as it appears in the '526 Patent. At the *Markman* hearing, Defendants sought to define "user" as "a health care provider at the point of care." (Docket No. 41-15 at 13). The Court found that "Defendants' proposal [was] too narrow and the term needs no construction." (*Id.*). In spite of this ruling, Defendants seek once again to restrict the term "user" to individuals operating at a point of care. Because Defendants essentially attempt to disrupt the Court's prior order, the proper means of bringing this issue to the Court's attention would have been a motion for reconsideration.

Motions for reconsideration may only be brought on the grounds of "(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision." Local Rule 7-18. Defendants refer in passing to new facts but do not attempt to meet the high standard embodied in Local Rule 7-18.

With the disputed claims fully construed in a separate proceeding, the Court need only address the legal arguments of the parties.

*Direct Infringement:* Defendants contend that Plaintiffs lack evidence to show that they infringed the '526 Patent either directly or indirectly. Defendants,

entities that build and sell health information management software, argue that Plaintiffs do not have evidence that they or any of their clients performed each step of the '526 Patent, a method patent, in sequential order as is required for a finding of infringement of this particular patent.

At the hearing, Plaintiffs' counsel narrowed the scope of the Court's inquiry considerably by clarifying that Plaintiffs only intend to pursue their allegations that Defendants directly infringed Claim 1 of the '526 Patent.

**Direct Infringement by Manufacture or Sale:** Defendants' production and sale of software cannot, in and of itself, support a claim for direct patent infringement because the '526 Patent claims methods. *See Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1256 (Fed. Cir. 2005) (Method patent cannot be directly infringed "by one who makes or sells the components of the system."). Finding direct infringement of a method patent requires that the purported infringer perform each step of the patented method. *See Ricoh Co., Ltd. v. Quanta Computer, Inc.*, 550 F.3d 1325, 1333 (Fed. Cir. 2008) ("Infringement of a method claim occurs when a party performs all of the steps of the process.") (quotation and citation omitted); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009) (A "finding of infringement can rest on as little as one instance of the claimed method being performed during the pertinent time period.").

It is well-settled law in the Federal Circuit that selling infringing software does not constitute **performance** of a method. *Harris*, 417 F.3d at 1256; *see also Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013) ("To establish liability for direct infringement of a claimed method or process under 35 U.S.C. § 271(a), a patentee must prove that each and every step

of the method or process was performed.").  Thus, Plaintiffs' direct infringement claim cannot be premised solely on Defendants' manufacture or sale of accused software.  Plaintiffs' counsel did not dispute this conclusion at the hearing on the Motions.

***Direct Infringement by Demonstration or Testing:***  As a result, the only proffered basis for finding that Defendants directly infringed the '526 Patent would be a showing that Defendants actually performed the sequential steps of a method taught by the '526 Patent in their own use of the accused software.  Plaintiffs' theory of infringement in this regard is that they have sufficient direct or circumstantial evidence to show that Defendants necessarily performed the steps of the claimed methods by testing their products and/or by demonstrating their products to obtain certification for medical use.  (Docket Nos. 67, 69).

This theory of infringement departs from Plaintiffs' previously articulated contentions.  The Complaint accuses Defendants of making and selling infringing software, referring to certification as ***proof*** of structural infringement, not as direct evidence of use.  (Compl. ¶¶ 18-20).  Essentially, the Complaint alleges that the accused software unavoidably infringes the claimed methods in a literal way.  The Complaint says nothing about demonstrations or product testing.  The Complaint, when mentioning "use," does not attribute that "use" to Defendants.  Plaintiffs confirmed this approach in their interrogatory responses.  (Docket No. 41-12).  When asked to identify each step a user of Defendants' software must take to infringe the '526 Patent, Plaintiffs stated that no particular steps need to be taken, instead asserting that the software infringes as sold such that any use reads on the '526 Patent.  (*Id.*).  Plaintiffs' recent arguments are also premised in part "on a technical document's paragraph, specifically Paragraph 2.9.1 of the CCHIT

1  Certification Handbook, that was not cited in Dr. Cooper's report, that no witness

2  discussed at deposition, and that Uniloc did not identify in response to

3  interrogatory responses."  (eClinicalWorks' Reply at 24).

4       In spite of this background, the Court would not, and does not, now say that

5  the newly articulated theory is outside the bounds of the operative Complaint such

6  that Plaintiffs are barred from relying on it.  Rather, the Court finds that there is

7  simply no basis for finding a genuine issue of material fact to be decided under any

8  theory of infringement articulated by Plaintiffs.  Under Federal Circuit law,

9  chronologically dependent steps in a claimed method must be performed

10 sequentially for a finding of infringement.  *See E-Pass Techs., Inc. v. 3Com Corp*,

11 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("Substantively, because the language of

12 most of the steps of its method claim refer to the completed results of the prior

13 step, [plaintiff] must show that all of those steps were performed in order."), citing

14 *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.*, 152 F.3d 1368, 1376 (Fed. Cir.

15 1998) ("[T]he sequential nature of the claim steps is apparent from the plain

16 meaning of the claim language and nothing in the written description suggests

17 otherwise.").

18      The '526 Patent teaches sequential methods since certain steps of each

19 independent claim rely on the occurrence of immediately preceding steps within

20 that claim.  For example, step (b) of Claim 1 occurs "in response to step (a)".

21 ('526 Patent, 12:48-51).  Because certain steps of each independent claim can only

22 be performed in response to the execution of other, previous steps within that

23 particular claim, the steps must occur sequentially, as dictated by the patented

24 method, in order to find an act of direct infringement.  As a result, it is Plaintiffs'

25 burden to show a genuine issue of material fact whether the steps of the claimed

1  methods were not just performed, but performed in the order dictated by the '526

2  Patent.

3       Although testing and demonstrative exhibition can constitute infringing use,

4  Plaintiffs have not pointed to any genuine issues of material fact that render the

5  purported infringement anything but hypothetical.  Plaintiffs have not identified

6  evidence from which it could be concluded or inferred that Defendants actually

7  performed each sequential step of any independent method taught by the '526

8  Patent.  *See Harris*, 417 F.3d at 1256 (finding that plaintiff did not show "that the

9  claimed method is actually carried out, rather than simulated" when tested by a

10 defendant); *see also Aristocrat*, 709 F.3d at 1363 (no evidence that testers

11 performed each step of infringing process); *cf. Vita-Mix Corp. v. Basic Holding,*

12 *Inc.*, 581 F.3d 1317 (Fed. Cir. 2009) (finding sufficient to withstand summary

13 judgment expert testimony that certain known testing and demonstrations

14 constituted direct infringement).  Here, as in *Harris*, Plaintiffs fail to raise any

15 question of fact whether Defendants' actually completed each sequential step of

16 the claimed methods as a user, rather than simulating their own programs or

17 performing the steps out of order.

18      ***Internal Testing:***  At the hearing on August 20, 2013, Plaintiffs' counsel

19 made an oral motion pursuant to Federal Rule of Civil Procedure 56(d), requesting

20 that the Court defer consideration of the pending Motions for Summary Judgment

21 until an outstanding discovery dispute can be heard and decided by the Magistrate

22 Judge.  The discovery dispute pertains to evidence of internal test scripts.  Without

23 additional discovery, Plaintiffs essentially concede that they lack sufficient

24 evidence to resist summary judgment as to direct infringement during internal

25 testing.

The disposition of Defendants' Motions for Summary Judgment of Non-Infringement requires either granting or denying Plaintiffs' request in order to determine the contents of the factual record from which a dispute may arise. Having considered the matter, the Rule 56(d) request is DENIED.

Plaintiffs' pending Motions to Compel are untimely under the Court's Scheduling Order, which sets April 8, 2013 as the discovery cut-off date. (CV11-10122 (Docket No. 24). This deadline was the last day on which any hearing on a motion to compel fact discovery could be heard. *See* Order Setting Scheduling Conference (CV11-10122 (Docket No. 21)) (requiring a proposed discovery cut-off date and noting "[t]his means the final day for completion of discovery, including resolution of all discovery motions."); *see also* Order Re Jury Trial (incorporated by reference at CV11-10122 (Docket No. 48)) ("This is not the date by which discovery requests must be served; it is the date by which all discovery, *including all hearings on any related motions*, is to be completed.") (emphasis in original). The rough transcript of the June 25, 2012 scheduling conference reveals that the Court so advised the parties. ("And again, that's the cut-off for a hearing as well."). The Motions to Compel were not filed until August 16, 2013, over four months after the deadline. Pursuant to Rule 16, the Magistrate Judge is without authority to decide the Motions to Compel since the deadline has passed.

Nonetheless, it is apparent that all parties were confused about the meaning of the discovery cut-off date. (*See, e.g.,* Docket No. 97). In light of the potential ambiguity evidenced by the parties' manifest confusion, the Court would not be prepared to deny Plaintiffs' Rule 56(d) request on the basis of Rule 16 alone. But independent and compelling justifications for denial exist beyond the Rule 16 violation.

***First,*** Plaintiffs considerably delayed the filing of their Motions to Compel for months after learning of the existence of the purported test scripts. Plaintiffs confirmed that defendant Pulse tests its software in a Rule 30(b)(6) deposition on April 18, 2013. They confirmed eClinicalWorks' use of regression testing and scripts on April 3, 2013. Plaintiffs rely on these confirmations in seeking test script documents, although they were aware of them around the time of the discovery cut-off date and could have moved to compel their production then.

***Second,*** whether Plaintiffs' requests for production contemplated these specific documents is itself an ambiguous question. The pertinent Request for Production is Uniloc's Request for Production No. 76, which seeks "[a]ll documents relating to the conception and development of the ACCUSED INSTRUMENTALITY, including engineering or laboratory entries, day planner activities, calendar entries, plans, charts, Gantt charts, specifications, requirement documents, design documents, implementation documents, verification documents, diagrams, schematics, analyses, tests, or change logs for each version of the ACCUSED INSTRUMENTALITY."

Defendant eClinicalWorks objected to this Request for Production as irrelevant, overbroad, and unduly burdensome, but agreed to produce responsive documents to the extent they existed. The Court would sustain eClinicalWorks' objections as to over breadth and burden since the Request for Production, read literally, requires any document pertaining to the accused software whatsoever, unlimited by allegations of infringement and unbounded as to time. Defendant Pulse did not object but stated its search for responsive documents remained ongoing. In spite of Defendants' non-committal responses, Plaintiffs did not meet

and confer with eClinicalWorks about responsive documents until July 22, 2013. The meet and confer with Pulse did not occur until August 6, 2013.

Plaintiffs' contention that Defendants operated under a continuing duty to produce responsive material is unavailing because, given Plaintiffs' shifting theories of infringement, there is no basis for concluding that Defendants were aware of the responsiveness of the documents, if any, during the fact discovery period. Simply, it appears that no party was aware of the relevance of internal test scripts until after Defendants filed their Motions for Summary Judgment of Non-Infringement and Plaintiffs formulated an infringement theory premised on internal testing.

***Third,*** it is entirely speculative whether, once produced, Plaintiffs will be able to show by expert opinion that a genuine issue of material fact exists as to direct infringement. In fact, it is not even clear that defendant Pulse uses test scripts to perform its internal testing. Testing is performed but Plaintiffs do not cite any discovery responses or deposition testimony to indicate that specific Pulse documents exist. Contrary to Plaintiffs' argument, it is not obvious that testing necessarily requires "test scripts."

Because the Rule 56(d) request is denied, Plaintiffs are awaiting no further discovery that could provide additional support for their position or raise genuine issues of material fact. The record before the Court is complete.

Without additional discovery, Plaintiffs rely solely on the expert reports of Dr. Richard Cooper and the fact that Defendants admittedly test their software to argue that mere execution of source code resulted in direct infringement. (Docket No. 41-20, 41-21, 41-26, 41-27). This argument is analytically flawed because direct infringement requires not just isolated performance of steps of a method

patent, but step-by-step sequential performance where a sequence is demanded by the claimed method. Plaintiffs have missed at least one analytical phase – they fail to identify evidence tending to show that testing the accused software actually meant **practicing** the methods taught by the '526 Patent. *See generally Aristocrat*, 790 F.3d at 1348.

Plaintiffs also fail to counter Defendants' point that place holder data is used to test the accused software, as opposed to data pertaining to "a particular patient" or "for a specific patient" as required by the '526 Patent. At the hearing, the parties focused their arguments on whether the language of Claim 1 requires data associated with a real-world patient, as opposed to data pertaining to a fictitious character, but the deficiency in Plaintiffs' position on this question is even more fundamental: Plaintiffs have not identified evidence that Defendants' internal testing uses data associated with **any** patient, real or invented. There is no evidence in the record to suggest that internal testing met the more general patient requirement in the first place.

***Demonstrations in Conjunction with Certification:*** In the alternative, Plaintiffs propose that Defendants performed each step of the method taught by Claim 1 of the '526 patent by demonstrating their software on one or more occasions in conjunction with a federal certification process. In sum, Plaintiffs argue that Defendants' software is in compliance with the federal standards for electronic health records ("EHR") as determined by the Certification Commission for Health Information Technology ("CCHIT"). Plaintiffs contend that CCHIT certification requires a software demonstration that infringes Claim 1; because demonstration is required for certification, and Defendants' software is CCHIT

certified, Plaintiffs argue that they raise an inference of direct infringement. It is not disputed that Defendants demonstrated their software to obtain certification.

The crucial question on the direct infringement claim, therefore, is whether the CCHIT test scripts require a demonstrator to perform each sequential step of Claim 1. Defendants assert that Plaintiffs have not shown a genuine issue of material fact on this question by way of their expert reports. The Court agrees.

While it is undisputed that the accused software is CCHIT certified, Plaintiffs do not point to any evidence indicating that the procedures required for CCHIT certification result in performance of the methods taught by the '526 patent in the claimed manner, *i.e.* in the order prescribed by the '526 Patent. (*See, e.g.,* Ex. A to eClinicalWorks Reply (Docket No. 76-1)).

Notably, Plaintiffs' expert does not offer ***any*** analysis regarding whether the CCHIT procedures read on Claim 1 in sequence. (*See, e.g.,* Amended Report at ¶ 18.11 (explaining relevant legal standard without discussing sequence); ¶¶ 36.1-36.7 (pulling isolated citations from the CCHIT procedures to show that elements of Claim 1 are present). Instead, Dr. Cooper identifies disparate sections of the CCHIT test scripts that purportedly infringe portions of the claims taught by the '526 patent. But as eClinicalWorks notes, Dr. Cooper "fails to cite a single sequential arrangement of test scripts that, when performed in order, would infringe the steps of any claim of the '526 Patent." (Reply at 19). It is not that he attempts and fails. Rather, his analysis is simply consistent with his recited view of the law that all elements need to be present, omitting any discussion of sequence. There is no discussion about the order of the CCHIT procedures and no opinion offered regarding how their execution infringes each step of Claim 1 sequentially.

Lacking an expert opinion as to sequence, Plaintiffs expect the Court to cobble together different portions of their expert reports to reach its own conclusion on chronology, arguing that this haphazard assessment shows that the steps of Claim 1 were ***necessarily*** performed in order during CCHIT certification demonstrations. Plaintiffs contend that since the CCHIT procedures are themselves performed sequentially, if number-ordered procedures are performed, they are performed in the order in which they appear in the CCHIT test scripts. They then attempt, by argument but not in expert opinion, to match sequential CCHIT procedures with the steps of Claim 1.

Delving into the CCHIT procedures cited by Dr. Cooper, however, it is apparent that the only complete chronological procedures offered by Plaintiffs do not sequentially correspond with the ordered steps of the claimed method. These are procedures 1.62 through 1.64. (*See* Docket No. 68-3 at 28-30). Performance of CCHIT procedures 1.62 through 1.64 does not necessarily result in direct infringement of Claim 1 the '526 Patent for a number of reasons:

***First***, Dr. Cooper does not cite an ordered step necessarily reading on a "patient information hierarchy," which the Court previously defined as "an organization of information related to a patient that is arranged into categories and one or more subcategories." (Docket No. 41-15 at 3). The portion of the CCHIT test script Dr. Cooper cites for the existence of subcategories does not facially exhibit them. (Amended Report at ¶ 36.1.6).

***Second,*** the CCHIT test script sections Dr. Cooper relies on to show direct infringement of the preamble of Claim 1 are remote in sequence and unit from procedures 1.62-64. In other words, those sections pertain to different components of the test script.

---

***Third***, Dr. Cooper does not explain how the patient information hierarchy, if one is indeed required by the CCHIT test script, is "designed" under the control of the user. No procedures are cited for this proposition. Analytically, populating an existing medical record form cannot be characterized as a user's "designing" the record. The preamble of Claim 1, either read in light of the rest of the '526 Patent or read in isolation, makes clear that the user is enabled to exercise control over the structure of the patient information hierarchy in the claimed method.

This deficiency is further highlighted by the fact that that no evidence is offered to show that the CCHIT test scripts require a demonstrator to "create" new parameters rather than select parameters from pre-existing lists for inclusion in the patient record. The CCHIT test script excerpts do require that compliant software allow users to ***modify*** parameter result values and parameters, but nothing supports a conclusion that users must be enabled to ***design*** patient hierarchies in the sense that demonstrators create parameters when needed. For example, the procedures Dr. Cooper relies on to show that a CCHIT demonstrator must "create" parameters actually requires the demonstrator only to select or modify parameters or generate result values. (Amended Report ¶ 36.2.3).

***Fourth***, procedure 1.62 applies only to Child Health Certification under CCHIT. There are no facts before the Court regarding whether either Defendant is so certified, undermining the assumption that either Defendant completed this procedure at any time.

***Fifth,*** enacting CCHIT procedures 1.62 through 1.64 in order does not read on the sequential steps of Claim 1. Procedures 1.62 through 1.64 require the following sequence of steps:

- 1.62: Enter prescription for Amoxicillin 250 mg/5ml, 15ml, 4 times a day for a juvenile patient;

- 1.62: The system alerts the user that the dosage is incorrect based on the patient's weight;

- 1.62: The user does not complete the prescription;

- 1.63: The user selects a dosage calculator;

- 1.63: The dosage calculator is used to calculate the appropriate dose for the patient's weight (this step specifically does not require automatic calculation or automatic population of fields);

  o However, this procedure is alternatively satisfied if the software "is able to advise the provider of the proper dosing based on weight";

- 1.64: Amoxicillin prescription is created;

- 1.64: The Amoxicillin prescription is associated with a problem called "right otitis media";

- 1.64: The Amoxicillin prescription is populated with at least data pertaining to the medication name, form, strength, dispense quantity, refills, and sig;

  o This step incorporates the dosage modified for the child's body weight.

According to Plaintiffs' argument, performance of these CCHIT procedures in order results in direct infringement of Claim 1. A close analysis of Dr. Cooper's opinions, however, reveals otherwise. The Court must reiterate that Dr. Cooper did not look at the CCHIT procedures in sequence. Instead, he listed each step of each claim in the '526 Patent (for the most part) and pulled quotes from throughout the CCHIT procedures to show that each step was performed. He did not identify the CCHIT test script excerpts by their specific procedure numbers. This

complicates and undermines the usefulness of his opinions.  But by matching the
CCHIT test script excerpts with the numbered procedures from which they were
culled, the Court finds that it is not possible to say Dr. Cooper's reports support
Plaintiffs' argument.

The steps of Claim 1 simply do not match a sequential performance of the
cited CCHIT procedures:

| Step of Claim 1 | Allegedly Sequential Corresponding CCHIT Procedure |
|---|---|
| A method in a computer system for designing, under the control of a user, a patient information hierarchy, the hierarchy containing a plurality of parameters including a linked-from parameter having a linked-from possible result value that is linked to one or more linked-to parameters, the method comprising the steps of: | None for the entirety of the preamble but **CCHIT procedure 1.63** is cited for the proposition that "[t]he CCHIT certified 2011 Ambulatory HER test script shows that the dosage (Result value of a linked-from parameter) of a medication is linked to the weight (linked-to parameter) of the patient." (Amended Report ¶ 36.1.9). |
| (a) receiving an instruction from the user to create a new parameter within the patient information hierarchy; | **CCHIT procedure 1.64.** (Amended Report ¶ 36.2.3). |
| (b) in response to step (a), creating a new parameter within the patient | None specifically listed in the Amended Report but it is possible to |

| information hierarchy; | infer that Dr. Cooper again cites to **CCHIT procedure 1.64.** (Amended Report ¶ 36.2.3). |
|---|---|
| (c) receiving an instruction from the user to specify a plurality of indicated possible result values for the new parameter; | **CCHIT procedure 1.64** (Amended Report ¶ 36.3.2); **CCHIT procedure 1.63**.  (Amended Report ¶ 36.3.4). |
| (d) in response to step (c), specifying the indicated possible result values as possible result values of the new parameter; | **CCHIT procedure 1.64**. (Amended Report ¶ 36.4.1). |
| (e) receiving an instruction from the user to link an indicated linked-from possible result value among the possible result values of the new parameter to one or more indicated linked-to parameters contained within the patient information hierarchy; | **CCHIT procedure 1.63**. (Amended Report ¶ 36.5.3). |
| (f) in response to step (e), within the patient information hierarchy, linking the indicated linked-from possible result value to the indicated linked-to parameters, such that the new parameter is a linked-from | **CCHIT procedure 1.63** (Amended Report ¶ 36.6.3); **CCHIT procedure 1.64**.  (Amended Report ¶ 36.6.5). |

|  | parameter, and such that, when the new parameter is displayed for a particular patient, if the new parameter has the linked-from possible result value, the linked-to parameters are displayed in conjunction with the new parameter. |  |
|---|---|---|

At the very least, Dr. Cooper's analysis suggests that CCHIT procedure 1.63 must be performed out of order to directly infringe on step (e) of Claim 1 of the '526 Patent. Consequently, assuming that either Defendant performed the CCHIT procedures in their internally-numbered sequence, no direct infringement would result because the method taught by Claim 1 would not be performed as specified by the '526 Patent.

Moreover, in their Oppositions and at oral arguments, Plaintiffs conflated steps (a) through (d) of Claim 1 and characterized them as steps that "create a parameter." Similarly, Plaintiffs called steps (e) and (f) the "linking steps." But reading Claim 1 at this level of abstraction is not called for by the language of the '526 patent. Otherwise, Claim 1 would only have two steps. The Court cannot distil the steps of the Claim into something simpler just for the sake of clarity – to do so would rob the '526 Patent of its intended meaning and has no basis in the record before the Court. Claim 1 has six sequential steps. Plaintiffs have not shown a disputed fact tending to show that the CCHIT procedures require performance of those steps in the order in which they are taught.

At the hearing, Plaintiffs cited *A.B. Dick, Co. v. Burroughs Corp.*, for the proposition that intervening steps do not defeat a finding of direct infringement.

713 F.2d 700, 703 (Fed. Cir. 1983) ("It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.").  It is true that one cannot add a step to avoid infringement, but one also cannot cite disjointed and disparate steps from an accused method to prove direct infringement.  *See E-Pass Techs.*, 473 F.3d at 1222 ("In contrast, the evidence here shows, at best, that the Palm defendants taught their customers each step of the claimed method in isolation.  Nowhere do the manual excerpts teach all of the steps of the claimed method together, much less in the required order.").  As a result, any citation to distant CCHIT procedures cannot cure the deficiencies noted by the Court.

Plaintiffs also accurately note that circumstantial evidence can be used to resist a motion for summary judgment on direct infringement.  *See Vita-Mix*, 581 F.3d at 1326 (reversible error to require direct evidence of direct infringement).  In this case, however, the circumstantial evidence presented by Plaintiffs does not support an inference of infringement, it only supports a ***possibility*** that infringement could have occurred.  But the fact of infringing capability is insufficient to survive Defendants' Motions because the methods claimed by the '526 Patent are not limited to teaching bare capacity.  *See Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1329 (Fed. Cir. 2010) ("Unless the claim language only requires the capacity to perform a particular claim element, we have held that it is not enough to simply show that a product is capable of infringement; the patent owner must show evidence of specific instances of direct infringement.").  Nor are *ipse dixit* statements by experts sufficient to avoid summary judgment.  *See, e.g., Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 969 (Fed. Cir. 2013) (finding Dr. Cooper's analysis conclusory in an unrelated case).  Beyond

being non-sequential, Dr. Cooper's conclusions are unreasoned and the cited procedures do not appear to have a logical nexus to the claimed steps of the '526 Patent.  Dr. Cooper's conclusions with regard to the occurrence of testing and infringing uses of the software are similarly unsubstantiated.

Accordingly, Plaintiffs fail to identify a genuine issue of material fact as to direct infringement.

**_Indirect and Contributory Infringement:_**  Plaintiffs have not identified a genuine dispute of material fact undermining Defendants' argument that indirect infringement and contributory infringement cannot be shown.  For Defendants to be liable for either type of infringement, Plaintiffs must prove that all steps of the method patent were performed, either by Defendants' clients alone or in conjunction with Defendants.  _See, e.g., Akami Techs., Inc. v. Limelight Networks, Inc._, 692 F.3d 1301 (Fed. Cir. 2012) (en banc) (induced infringement of a method patent can occur if a defendant has performed some of the steps of a claimed method and has induced other parties to commit the remaining steps, or if the defendant has induced other parties to collectively perform all the steps of the method, even if no single party has performed all of the steps on its own); _see also Linear Tech. Corp. v. Impala Linear Corp._, 379 F.3d 1311, 1326 (Fed. Cir. 2004) ("There can be no inducement or contributory infringement without an underlying act of direct infringement."); _Dynacore Holdings Corp. v. U.S. Philips Corp._, 363 F.3d 1263, 1272 (Fed. Cir. 2004) ("Indirect infringement, whether inducement to infringe or contributory infringement, can only arise in the presence of direct infringement."); _Joy Techs., Inc. v. Flakt, Inc._, 6 F.3d 770, 775 (Fed. Cir. 1993) ("[T]he act of selling equipment which will not be used so as to directly infringe a method claim cannot constitute one of the dependent types of infringement, that is,

either contributory infringement or inducement of infringement."). Defendants'
Motions argue that Plaintiffs lack evidence to support either indirect or
contributory infringement.

In light of binding Federal Circuit case law, Plaintiffs must show a genuine
issue of material fact regarding an underlying act of direct infringement, which
means sequential performance of each step taught by the '526 Patent, as the Court
explained above. *See E-Pass Techs.*, 473 F.3d at 1222 (plaintiff's evidence did
"not demonstrate that [defendant] actually performed or induced anyone to
perform all of the steps of the claimed method, much less that it did so in the
necessary order."). Teaching one's clients each step of a patented method in
isolation is not sufficient. *Id.*

Plaintiffs have not identified a single purchaser of Defendants' software who
is alleged to have performed any of the steps of the claimed methods. Instead,
Plaintiffs once again argue that infringing capability is sufficient. (*See* Plaintiffs'
Statement of Genuine Disputes of Material Fact Regarding Defendants' Motions
for Summary Judgment of Non-Infringement at ¶ 48) (Docket No. 64)). Although
they cite Dr. Cooper's conclusion that "various source code routines . . . when
invoked and executed, performed the steps of the asserted claims," Plaintiffs do not
show that the codes were ***necessarily*** invoked or executed by any party or non-
party. (*Id.*).

Plaintiffs similarly fail to show circumstantial evidence tending to support a
finding of direct infringement, even accepting as true Dr. Cooper's conclusions
about the accused software's functionality. In sum, there is no evidence in the
record and no basis for inferring that an underlying act of direct infringement ever
occurred. There is only a speculative proposition that someone, at some point may

have invoked the source code in an infringing way.  This is insufficient to survive Defendants' Motions for Summary Judgment on the indirect theories of infringement because those theories depend on a predicate act direct infringement, which cannot be based merely on infringing capability.  *See Fujitsu Ltd.*, 620 F.3d at 1329; *see also E-Pass Techs.*, 473 F.3d at 1222 ("Accordingly, it requires too speculative a leap to conclude that any customer actually performed the claimed method.").

Because there are no genuine disputes of material fact and there are no inferences to be drawn in Plaintiffs' favor, Defendants are entitled to summary judgment on the indirect infringement claims.

Accordingly, the Motions for Summary Judgment of Non-Infringement are GRANTED.

## II.    MOTION FOR SUMMARY JUDGMENT OF INVALIDITY [36]

The Court need not reach Defendants' Motion for Summary Judgment on Invalidity.  The Motion is therefore DENIED AS MOOT.  (Docket No. 36).

The Magistrate Judge is directed to DENY AS MOOT the pending Motions to Compel scheduled for hearing on September 16, 2013.   (Docket Nos. 91, 93).

The Court ORDERS the Clerk to treat this Order, and its entry on the docket, as an entry of judgment.  Local Rule 58-6.

IT IS SO ORDERED.

Dated:_August 29, 2013
_____

_____
MICHAEL W. FITZGERALD
United States District Judge

# ADDENDUM 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:        Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

Present:  The Honorable MICHAEL W. FITZGERALD, U.S. DISTICT JUDGE

|     Rita Sanchez     |     Not Reported     |     N/A     |
| :---: | :---: | :---: |
| Deputy Clerk | Court Reporter/Recorder | Tape No. |

Attorneys Present for Plaintiff:          Attorneys Present for Defendants:
             Not Present                                        Not Present

**Proceedings (In Chambers):**   CLAIM CONSTRUCTION ORDER

        This action arises under the patent laws of the United States, Title 35, United States Code.  Plaintiff Uniloc Luxembourg S.A. ("Uniloc") alleges that Defendants are infringing U.S. Patent 5,682,526 ("the '526 patent").  The parties have identified thirteen disputed claim terms in the '526 patent that they assert require construction and have fully briefed their respective positions.  The Court held a hearing on February 22, 2013, at which a tentative claim construction order was issued.  Uniloc submitted on each of the Court's tentative constructions and Defendants submitted on all but five tentative constructions.  The Court has thoroughly considered the parties' arguments in addition to their briefs.

## I.      STANDARD FOR CLAIM INTERPRETATION

        District courts construe disputed claims objectively as understood by those ordinarily skilled in the art at the time the patented invention.  *See, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  "In interpreting an asserted claim, the court should look first to the intrinsic evidence on record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1314.

        In assessing intrinsic evidence, the Court first looks to the words of the claims themselves to define the scope of the patented invention.  *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that the claims of a patent

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

define the invention to which the patentee is entitled the right to exclude.").  Words
in a claim "are generally given their ordinary and customary meaning."  *Id.*  "A
determination that a claim term 'needs no construction' or has the 'plain and
ordinary meaning' may be inadequate when a term has more than one 'ordinary'
meaning or when reliance on a term's 'ordinary' meaning does not resolve the
parties' dispute."  *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co.,
Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

   Next, the Court looks to the patent specification "to determine whether the
inventor has used any terms in a manner inconsistent with their ordinary meaning."
*Vitronics*, 90 F.3d at 1582.  "The specification acts as a dictionary when it
expressly defines terms used in the claims or when it defines terms by
implication."  *Id.*  The Federal Circuit has explained that "the specification is
always highly relevant to the claim construction analysis.  Usually it is dispositive;
it is the single best guide to the meaning of a disputed term."  *Id.*  The Court's
construction of the claim terms therefore occurs in the context of the entire patent.
*See, e.g., Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1397 (Fed. Cir. 2008).  But
the Court must not import limitations from the specification into the claims it is
construing.  *See, e.g., Prima Tek II LLC v. Polypap, SARL*, 412 F.3d 1284, 1289
(Fed. Cir. 2005); *see also RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d
1255, 1264 (Fed. Cir. 2003) ("A basic claim construction canon is that one may not
read a limitation into a claim from the written description.").

   The Court also considers prosecution history of the patent, if it is in
evidence.  *Phillips*, 415 F.3d at 1317.  The prosecution history contains the entire
record of the prosecution of the patent claim before the U.S.P.T.O., including any
representations about the scope of the claim or the meaning of certain terms made
by the applicant.  *See, e.g., Nystrom v. TREX Co.*, 424 F.3d 1136, 1144 (Fed. Cir.
2005).  In this analysis, an applicant is held to the statements made during
prosecution to distinguish the prior art.  *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.  CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:    Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

## II.    CLAIM CONSTRUCTION

### A.  "patient information hierarchy"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "patient information hierarchy" | "An organization of information related to a patient that is arranged into categories and one or more subcategories" | "An organization of information stored in a database related to a patient that is arranged according to a ranking of that information"<br><br>OR<br><br>"An organization of information stored in a database related to a patient that is arranged according to a ranking of that information and that can be modified by a healthcare provide" | "An organization of information related to a patient that is arranged into categories and one or more subcategories" |

The parties' proposed constructions diverge with respect to two aspects of the term "patient information hierarchy":  (1) whether the organization of information is stored in a database; and (2) how the organization of information is arranged.

While the method and system taught by the '526 patent is comprised of software tools ("a patient information management facility"), it is not evident from the claims or specification that the information contained therein, or entered into the patient information hierarchy, is necessarily stored in a database.  There may be other methods for housing the data, and reading Defendants' proposed limitation into the '526 patent is unsupported by its language.  Instead of adding clarity, as Defendants propose, the phrase "stored in a database" potentially restricts the scope of the '526 patent by introducing an unnecessary limitation.

Nor is the ranking concept proposed by Defendants supported by the '526 patent.  An illustrated patient information hierarchy is included as Figure 3 in the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

'526 patent.  It shows patient information sorted into categories and subcategories.
The data are shown in a hierarchical tree form.  But the '526 patent could easily
teach a method and system organized in a collapsible outline.  The word "ranking"
is not apparent in the claims and does not clarify the organization taught by the
'526 patent.  It implies a weight and ordering not necessary for the creation a
patient information hierarchy.  The '526 patent refers to the patient information
hierarchy as allowing patient data to "be grouped in a way that is logical to the
user."  (4:62-65; 5:16-18).  The logic therefore allows grouping, rather than
ranking.

Much of the parties' disagreement at the hearing centered on whether the
Court ought to consider the detailed descriptions of Figures 3, 4, and 5 in the
specification as the singular and exclusive embodiments of particular features of
the '526 patent.  Relying on *Honeywell International, Inc. v. ITT Industries, Inc.*,
452 F.3d 1312 (Fed. Cir. 2006), Defendants argue that the language describing
Figures 3, 4 and 5 refers to the invention itself, rather than preferred embodiments
of the invention, and should be interpreted as limiting the scope of the claim terms.
Uniloc ardently disagrees.

Although the Federal Circuit has held that there are some instances when
language contained in a specification can operate as a restriction on claim terms,
the hallmarks of those cases are not present here.  In *Honeywell*, the specification
described the only embodiment of the invention and consistently referred to that
embodiment as "the present invention" and "this invention."  *Honeywell*, 452 F.3d
at 1318.  Defendants argue that because the descriptions of Figures 3, 4, and 5 are
not prefaced by statements that they are merely preferred embodiments, they fall
under the purview of *Honeywell*.  But the Court does not read *Honeywell* to apply
so broadly, and the detailed descriptions of Figures 3, 4, and 5 do not purport to
describe the invention *qua* invention.  *Cf. Chimie v. PPG Indus.*, 402 F.3d 1371,
1379 (Fed. Cir. 2005) ("[W]hen the preferred embodiment is described in the
specification as the invention itself, the claims are not necessarily entitled to a
scope broader than that embodiment."); *Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361, 1367 (Fed. Cir. 2007) (a limitation from the specification was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

properly read into the claim term because it was not a preferred embodiment, but "a critical element in the process").

The Court must strike a balance between reading the claims in light of the specification and declining to read limitations from the specification into the claims and does so by concluding that Figures 3, 4, and 5 are merely preferred embodiments of the invention, not limitations on the claim terms themselves. The Figures support this conclusion because they are exemplars, showing embodiments of the claimed inventions, rather than complete graphical depictions of the invention's aspects. Figure 3 shows what a patient information hierarchy with particular parameters and result values may look like. Figure 4 shows what a parameter definition table may look like, given specific result values and parameters. Figure 5 is a software decision tree showing the routes a user may take when creating a new parameter.

Detailed descriptions of the Figures are in accord. Figure 3 is not described as the only embodiment of a patient information hierarchy, but rather as "the patient information hierarchy, which is composed of classifications, ***such as*** 310 and 320, and parameters, ***such as*** 311-331." (4:60-63, emphasis added). The description of Figure 4 indicates that "[t]he parameter definition table 400 contains the following columns, or fields, which ***may*** each contain information for each parameter." (5:27-30, emphasis added). The description of Figure 5 explains that it shows the steps involved in creating a parameter but states that it also "***preferably*** involves presenting the user with a list of classifications and receiving input from the user selecting one of the classifications." (6:9-12, emphasis added). This step is not shown on Figure 5 itself. Thus, Figure 5 is only one of the possible embodiments of the invention.

Importantly, the specification's description of the Figures concludes with a disclaimer: "While this invention has been shown and described with reference to preferred embodiments, it will be understood by those skilled in the art that various changes or modifications in form and detail may be made without departing from the scope of the invention." (12:34-38).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.  CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:    Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

Read in light of the Federal Circuit's guidance on this point, Figures 3, 4, and 5 are preferred embodiments of the invention rather than explications of the invention itself.  Because the Court concludes that the Figures in the specification merely display preferred embodiments of the claimed invention, the Court rejects Defendants' arguments that the patient information hierarchy must, as a definitional matter, be stored in a particular fashion.

Accordingly, "patient information hierarchy" is appropriately construed as "an organization of information related to a patient that is arranged into categories and one or more subcategories."

### B.  "parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "parameter" | No construction;<br><br>Or, in the alternative, "data field" | "A specific topic of information on which a user can record data relating to a patient and that is defined by the following; a parameter i.d., a parameter name, an indication of whether it is linked from other parameters, a normal value, and data type-specific information" | "Piece of patient information" |

The term "parameter" should be construed as "piece of patient information".  ***First***, the specification consistently defines the term as such.  (*See e.g.*, Abstract, 1:23-29, 2:2-6, 3:23-26, 4:29-32).  ***Second***, neither proposed construction is consistent with the use of the claim term or its embodiments in the specification. "Data field" implies a broad scope of potential entries beyond information pertaining to the patient.  Defendants' proposed construction takes aspects of parameters described in each independent claim and applies them to the term "parameter" as though those aspects are definitional across all claims.  They are not.  For example, a parameter in claim 4 is not necessarily linked to another parameter and nothing in the claim indicates that a user must specify whether the

A36

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

parameter is so-linked.  Thus, the linking quality is not definitional.  As discussed above, the Figures are merely preferred embodiments and should not be read to limit the definition of the claim term.  Accordingly, "parameter" is construed as "piece of patient information."

### C. "local parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "local parameter" | "A parameter where each instance of the parameter is independent from one another and where each instance of the parameter can have different values for a given patient" | "A parameter that can appear at more than one location in the patient information hierarchy and has a distinct value at each location"<br><br>In Reply, Defendants agree to Plaintiff's construction | "A parameter where each instance of the parameter is independent from one another and where each instance of the parameter can have different values for a given patient" |

The specification defines "local parameter" in contrast to global parameter, stating that local parameters "each have their own set of result values for each patient." (3:37-39).  A global parameter, on the other hand, is a parameter that can appear at more than one location in the patient information hierarchy and that contains the same result value at each location.  Defendants' proposal inaccurately characterizes the nature of a local parameter.  A local parameter may or may not contain a unique result value from all other parameters.  To require each local parameter to be distinct would be to read the claim term too narrowly.  In their Reply, Defendants agree to Uniloc's proposed construction.  Accordingly, "local parameter" is construed to mean "a parameter where each instance of the parameter is independent from one another and where each instance of the parameter can have different values for a given patient."  At the hearing, both parties submitted on the Court's construction.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:       Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

### D. "represent them together at a higher conceptual level"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "represent them together at a higher conceptual level" | "group them together" | Defendants argue the term is indefinite and cannot be construed | "group together parameters" |

Claim terms are only considered indefinite if they are "not amenable to construction or are insolubly ambiguous." *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007). Because the term at issue can be given a reasonable meaning, it is not indefinite for the purposes of construction. The Court also notes that Defendants have not moved for a judgment of invalidity of any claim in the '526 patent.

The term "represent at a higher conceptual level" is used to explain encapsulating parameters, and the descriptions of encapsulating parameters as well as the figures in the specification provide sufficient detail such that one skilled in the art would have understood its meaning at the time of the invention. The '526 patent consistently teaches that encapsulating parameters represent other parameters at a higher conceptual level by acting as a categorization, or, as Uniloc proposes, by grouping items together. (*See* 4:62-65; 5:17-23; 13:31-35; Fig. 3). These items are parameters. Accordingly, "represent them together at a higher conceptual level" is construed as "group together parameters." At the hearing, both parties submitted on the Court's construction.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

### E. "encapsulating parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "encapsulating parameter" | No construction;<br><br>Or, in the alternative, "a parameter that identifies and encapsulates one or more other parameters to represent them together at a higher conceptual level" | "A parameter that subsumes one or more other parameters and for which a user cannot record result values" | No construction necessary |

Claim 4 defines "encapsulating parameters" as identifying and encapsulating one or more other parameters to represent them at a higher conceptual level. (13:28-35). Defining the term twice would introduce unnecessary redundancy into the claims. Uniloc accurately notes that nothing in the '526 patent restricts encapsulating parameters from also having result values, and indeed at least one embodiment of the invention provides for encapsulating parameters to also have a result value. (12:20-28 ("Those skilled in the art will recognize that the description of the facility described above may straightforwardly be adapted to enable encapsulating parameters to have result values. Such an adaptation merely requires the separation of data type and encapsulating information in the parameter definition table."); *see also* 14:26-29 ("[S]tep (h) includes the step of displaying the result value for the selected primary encapsulated parameter as the result value for the first encapsulating parameter.")). Accordingly, construction of the term "encapsulating parameter" is unnecessary as the term is properly explained in the '526 patent and further definition would not add clarity. At the hearing, both parties submitted on the Court's tentative decision not to construe the term.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

### F.  "encapsulated parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "encapsulated parameter" | No construction; <br><br> Or, in the alternative, "A parameter that is represented in an encapsulating parameter" | "A parameter that is subsumed by an encapsulating parameter" | No construction necessary |

The Court sees no reasonable grounds for dispute as to the term meaning. *See Shuffle Master, Inc. v. VendingData Corp.*, 163 Fed. Appx. 864, 868, 2005 WL 3529124 (Fed. Cir. 2005) ("[I]t is not necessary for a court to conduct an explicit claim construction if the claim construction issue is a simple one that needs no analysis, or in which there is no reasonable ground for dispute as to claim meaning."). The divergence between the proposed constructions (subsumed/represented) requires no analysis. The meaning of the term "encapsulated parameter" is made clear by the meaning of the term "encapsulating parameter" and no additional construction is necessary. At the hearing, both parties submitted on the Court's tentative decision not to construe the term.

### G.  "result parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "result parameter" | No construction; <br><br> Or, in the alternative, "A parameter that may have a result value for each patient" | "A parameter for which a user may record observable or measurable data about a patient" | "A parameter that may contain a result value for a particular patient at a particular time" |

The specification defines "result parameter" as a parameter that may contain a result value for a particular patient at a particular time. (5:15-16). The definition is consistent with usage of the term throughout the '526 patent. (*See* 13:31-33). Defendants' proposal unduly restricts the type of data that may be reflected in a result parameter through a result value. Accordingly, "result parameter" is

---

**CIVIL MINUTES—GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

construed as "a parameter that may contain a result value for a particular patient at a particular time." At the hearing, both parties submitted on the Court's construction.

### H. "create a new parameter"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "create a new parameter" | No construction;<br><br>Or, in the alternative, "Create/creating a data field to hold information in the patient information hierarchy"" | "Create/creating new data fields for new pieces of patient information in a database that includes the user-controlled steps of (1) placing a new parameter at a location in the patient information hierarchy and (2) providing the information necessary to define a parameter"<br><br>OR<br><br>"Create/creating new data fields for pieces of patient information in a database that includes the user-controlled steps of (1) placing a new parameter at a location in the patient information hierarchy and (2) providing the information necessary to define a parameter" | No construction necessary |

No construction is necessary because the ordinary and customary use of "create" provides sufficient clarity in conjunction with the steps for creation discussed in the '526 patent. The specification does not use the term in a manner inconsistent with the ordinary and customary usage. Defendants do not convincingly argue otherwise. Rather, they appear to argue for an alternative construction of "parameter", which the Court construed above. Defendants also appear to confuse the process set forth by the '526 patent to create a new parameter

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)            Date:  February 28, 2013

Title:    Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

and the ***definition*** of creation.  Furthermore, Defendants' first proposed
construction flatly contradicts the language of the claims.  (6:3-6 (users may create
a new parameter "to represent an existing piece of patient information at an
additional location in the hierarchy.")).  Defendants' additional arguments rely on
their contention that the description of Figure 5 restricts the language of the claim
term – an argument the Court rejected above.

## I.  "parameter identifier"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "parameter identifier" | No construction;<br><br>Or, in the alternative, "A label or descriptor used to identify a parameter" | "A unique code identifying a parameter" | No construction necessary |

The parties disagree as to whether the term needs construction, whether the
identifier must be unique, and whether the identifier is a code or label/descriptor.
Defendants do not cite compelling language in the '526 patent to support their
contention that a parameter identifier ***must*** be unique.  Defendants cite only to one
preferred embodiment of the claimed system and also offer no specific argument
for defining an identifier as a code instead of as a label or descriptor.  The Court
concludes that the term does not need construction as a parameter identifier is
clearly something that identifies a parameter.  Although an identifier may logically
need to be unique in order to functionally identify an item, the '526 patent does not
compel this outcome without deviation.  Indeed, requiring that a parameter
identifier be unique introduces redundancy into the claims because the claims
specifically teach that under certain circumstances two parameters are "both
identified by a first parameter identifier" while there are other circumstances
"wherein . . . the parameter identifiers are distinct."  (15:24-38).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

### J.  "result value"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "result value" | No construction;<br><br>Or, in the alternative, "Data relating to a patient" | "Observable or measurable data documented for a specific parameter relating to a patient" | "Data relating to a patient" |

Just as Defendants' proposal for "result parameter" unduly restricts the type of data that may be reflected in a result parameter, so too does their proposal for construing "result value" unduly restrict the scope of the claims. Additionally, tethering the term to its inclusion in a parameter is not required by the language of the claims, and the Court may not read a limitation from the specification into the claim terms. The '526 patent instead consistently uses the term to describe data relating to a patient. The term must be construed to reference specific patient data in order to prevent an overbroad interpretation of the claims, but it is not necessarily limited to observable or measurable data. Accordingly, "result value" is construed as "data relating to a patient." At the hearing, both parties submitted on the Court's construction.

### K.  "user"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "user" | No construction;<br><br>Or, in the alternative, "An operator of a computer system" | "A health care provider at the point of care" | No construction necessary |

The term "user" has a common and ordinary meaning easily understood by a jury. Although the invention is directed at health care providers, nothing in the '526 patent strictly limits its use to that community or to that community at a point of care. For example, it is perfectly feasible that an insurance auditor may review health insurance claims against patient records, or that a health care provider may

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES—GENERAL**

Case No.   CV-11-10122 MWF (PLAx)          Date:  February 28, 2013
Title:     Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

direct an external contractor to arrange the parameters in a specific way to meet that provider's needs.  (*See* 2:1-9 ("In a preferred embodiment, a patient information management facility enables users to customize a patient information hierarchy . . . in a way that is optimized for the structure and procedures of the particular health care organization.").  The specification does not use the term in a manner inconsistent with this ordinary and customary usage, and there is nothing in the '526 patent to preclude "users" from being individuals removed from the point of care.  Accordingly, Defendants' proposal is too narrow and the term needs no construction.

### L.  "author name field"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "author name field" | "field that identifies the author" | No construction | No construction necessary |

The term "author name field" should be given its plain and ordinary meaning.  No further clarification of the term is necessary because nothing in the plain and ordinary meaning of the term would exclude the use of initials as opposed to full names, and the specification does not use the term in a manner inconsistent with the ordinary and customary usage.  At the hearing, both parties submitted on the Court's tentative decision not to construe the term.

### M. "time field"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal | Court's Construction |
|---|---|---|---|
| "time field" | "field that holds a time or date" | No construction | "a field that holds a time and may also hold a date" |

The term "time field" should be construed, based on the specification and claim language, to reflect the possible inclusion of a date in addition to a time.  (Figs. 8, 21).  The specification supports a conclusion that "time field" can reflect a date in addition to a time, but nothing in the '526 patent reflects a situation in which a time field *only* contains a date.  Accordingly, "time field" is construed as

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES—GENERAL

Case No.   CV-11-10122 MWF (PLAx)                Date:  February 28, 2013
Title:       Uniloc Luxembourg S.A. v. Compulink Business Systems, Inc. et al.

"a field that holds a time and may also hold a date."  At the hearing, both parties submitted on the Court's construction.

        IT IS SO ORDERED.


                                                    ___: N/A
                                    Initials of Preparer    RS

# ADDENDUM 3

US005682526A

# United States Patent [19]

## Smokoff et al.

[11] Patent Number: 5,682,526

[45] Date of Patent: Oct. 28, 1997

[54] **METHOD AND SYSTEM FOR FLEXIBLY ORGANIZING, RECORDING, AND DISPLAYING MEDICAL PATIENT CARE INFORMATION USING FIELDS IN A FLOWSHEET**

[75] Inventors: **Timothy L. Smokoff**, Renton; **Tom Marlin**, Edmonds, both of Wash.; **Herbert J. Uhrig**, Duluth, Ga.

[73] Assignee: **SpaceLabs Medical, Inc.**, Redmond, Wash.

[21] Appl. No.: **504,801**

[22] Filed: **Jul. 20, 1995**

[51] Int. Cl.[6] ..................................................... G06F 17/30

[52] U.S. Cl. ........................... 395/615; 395/602; 395/611; 128/710

[58] Field of Search ....................... 364/413.01; 395/161, 395/600, 700, 608, 764, 768, 601, 603, 765, 202; 340/172.5; 128/710

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,872,448 | 3/1975 | Mitchell, Jr. | 340/172.5 |
| 4,878,175 | 10/1989 | Norden-Paul et al. | 364/413.01 |
| 5,077,666 | 12/1991 | Brimm et al. | 364/413.02 |
| 5,247,611 | 9/1993 | Norden-Paul et al. | 395/161 |
| 5,253,361 | 10/1993 | Thurman et al. | 395/603 |
| 5,253,362 | 10/1993 | Nolan et al. | 395/601 |
| 5,301,319 | 4/1994 | Thurman et al. | 395/600 |
| 5,307,262 | 4/1994 | Ertel | 364/413.01 |
| 5,325,478 | 6/1994 | Shelton et al. | 395/768 |
| 5,337,405 | 8/1994 | Lindauer | 395/764 |
| 5,410,704 | 4/1995 | Norden-Paul et al. | 395/700 |
| 5,482,050 | 1/1996 | Smokoff et al. | 128/710 |
| 5,546,580 | 8/1996 | Seliger et al. | 395/600 |
| 5,592,945 | 1/1997 | Fiedler | 128/710 |

### OTHER PUBLICATIONS

"System Administrator Guide," SpaceLabs Medical, Inc. PC Chartmaster, 1994.

"Operations Manual," SpaceLabs Medical Inc., PC Chartmaster, 1994.

Fackler et al. "Integration of Intermittent Clinical Data with Continuous Data from Bedside Monitors", Computer–Based Medical Systems, 1993 Symposium, pp. 289–294.

Petroni et al. "An Automatic Speech Recognition System for Bedside Data Entry in an Intensive Care Unit", Circuits and Systems, 1990 IEEE Midwest Symposium, pp. 791–794.

Saab et al. "Data Modeling and Design of a Patient Data Management System in an Intensive Care Unit", Computer Based Medical Systems, 1992 Symposium, May 1992, pp. 54–63.

Primary Examiner—Thomas G. Black
Assistant Examiner—Charles L. Rones
Attorney, Agent, or Firm—Seed and Berry LLP

[57] **ABSTRACT**

A method and system for flexibly organizing, recording, and displaying medical patient care information is provided. In a preferred embodiment, a patient information management facility enables users to customize a patient information hierarchy, which defines and organizes the information that may be stored about each patient, as well as patient data flowsheets, which define views in which the patient data stored according to the hierarchy may be entered and viewed, in a way that is optimized for the structure and procedures of the particular health care organization. The facility enables users to add, modify, and rearrange global or local patient information parameters that make up the hierarchy. Users may define the parameters to be any of a number of types. The user may also customize flowsheets used for entering and displaying result values of parameters defined in the hierarchy for particular patients. The user may expand and contract overview encapsulating parameters to display or hide the encapsulated parameters encapsulated therein. The facility also allows the user to link a result value of one parameter to other parameters, causing the linked-to parameters to be displayed when the result value is entered.

**25 Claims, 21 Drawing Sheets**

A46



*FIG. 1*

EXHIBIT A PAGE 14

Case 2:12-cv-01005-GMS Document 24 Filed 01/27/14 Page 122 of 153



*FIG. 2*

EXHIBIT *A* PAGE 15

Case 1-005 CASE POST CIDOC GN24 Document 133 Filed 01/25/2014 Page 123/21 Filed 01/17/2014



**FIG. 3**

EXHIBIT A PAGE 16

**FIG. 4**

parameter definition table 400

| parameter id 401 | parameter name | linked from parameter 402 | parameter data type 403 | normal value 404 | data type - specific information 405 / 406 |
|---|---|---|---|---|---|
| 10001 | cough | yes | select | none | none / non-productive 10013, 10014 / productive 10013, 10014 |
| 10002 | respiration | no | select | normal | normal / heavy / shallow |
| 10003 | chest sounds | no | select | none | none / soft / loud |
| 10004 | sleep | no | select | | awake / asleep |
| 10005 | Demerol | no | encapsulating | | *10007, 10008, 1009 |
| 10006 | Amoxicillin | no | encapsulating | | *10010, 10011, 10012 |
| 10007 | dose | no | integer | | |
| 10008 | dose units | no | select | cc | mg / cc |
| 10009 | route | no | select | intravenous | oral / intravenous |
| 10010 | dose | no | integer | | |
| 10011 | dose units | no | select | mg | mg / cc |
| 10012 | route | no | select | oral | oral / intravenous |
| 10013 | sputum color | no | select | | white / yellow / green |
| 10014 | sputum amount | no | select | | white / yellow / green |
| ... | | | | | |

Case 4:10-cv-03005-CAS 4:07-cv-00124 Document 23 Page 125 of 153 Filed 07/25/2014 01/07/2014

FIG. 5

EXHIBIT A PAGE 18



FIG. 6

EXHIBIT A PAGE 19

Case 2:10-cv-01005-CAS-PLA Document 24 Filed 01/27/2014 Page 127 of 153



*FIG. 7*

result table — 700

| patient i.d. 701 | parameter i.d. 702 | result time 703 | result value 704 |
|---|---|---|---|
| 100001 | 10001 | 01/25 23:00 | none |
| 100001 | 10003 | 01/25 23:00 | soft |
| 100002 | 10001 | 01/25 23:00 | non-productive |
| 100002 | 10001 | 01/26 00:00 | productive |
| 100002 | 10004 | 01/25 23:00 | asleep |
| 100002 | 10004 | 01/26 00:00 | asleep |
| 100003 | 10007 | 01/26 00:00 | 100 |
| 100003 | 10008 | 01/26 00:00 | mg |
| ... | | | |

11
12
13
14
15
16
17
18

EXHIBIT A PAGE 20

Case 1:13-cv-01005-RGA Document 24 Filed 07/03/14 Page 128 of 153
Case 1:13-cv-01005-RGA Document 24 Filed 01/17/2014 Page 128 of 153



*FIG. 8*

A54

EXHIBIT _A_ PAGE _21_

Case 1:13-cv-00919-LPS Document 24 Filed 01/25/14 Page 129 of 153



**FIG. 9**

EXHIBIT _A_ PAGE _22_



FIG. 10

EXHIBIT _A_ PAGE 23

Case 1:12-cv-01004-GMS Document 24 Filed 01/07/14 Page 131 of 153



FIG. 11

EXHIBIT A PAGE 24



*FIG. 12*

EXHIBIT *A* PAGE 25

Case 1:15-cv-01005-CASE-POLK-CA Document 1-24 Filed 02/13/2014 Page 133 of 153 Page ID #: 0133



*FIG. 13*

EXHIBIT A PAGE 26

Case 2:12-cv-01005-DOC-JPR Document 24 Filed 07/14/14 Page 134 of 153 Page ID #:3713



*FIG. 14*

EXHIBIT *A* PAGE 27



FIG. 15

EXHIBIT A PAGE 28

Case 2:10-cv-01823 Case 4:07-cv... Document 24 Document 33 Page 136 of... Filed 03/16/2014 Page 01/17/2014



FIG. 16

EXHIBIT _A_ PAGE 29

Case 1:14-cv-01052-TSC-DAR Document 24 Filed 01/17/2014 Page 137 of 153



*FIG. 17*

EXHIBIT A PAGE 30

Case 1:15-cv-00583-GMS Document 1-4 Filed 03/28/15 Page 138 of 153 PageID #: 233



*FIG. 18*

EXHIBIT A_ PAGE 91

Case 1:05-cv-04057-CAS-ONT Document 24 Filed 01/17/2014 Page 139 of 153



FIG. 19

EXHIBIT _A_ PAGE _32_

Case 1:10-cv-01005-CASE-POST CAD PRINT-GON-24 Document 24 Page 597/23 Filed 06/07/20 Page 01/07/2014



FIG. 20

EXHIBIT A PAGE 33

Case 1:10-cv-01067-LPS Document 244 Filed 01/17/2014 Page 141 of 153



**FIG. 21**

EXHIBIT A PAGE 34

5,682,526

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD AND SYSTEM FOR FLEXIBLY ORGANIZING, RECORDING, AND DISPLAYING MEDICAL PATIENT CARE INFORMATION USING FIELDS IN A FLOWSHEET

## TECHNICAL FIELD

The invention relates generally to a field of patient information management, and, more specifically, to the field of medical patient care information organization and display.

## BACKGROUND OF THE INVENTION

The provision of health care services to patients depends on the maintenance of significant quantities of patient information, including both clinical information relating to patient treatment and patient management information, such as referral, admission, insurance, and billing information. Health care providers have traditionally maintained such patient information manually, on physical "charts" comprised of paper forms, also known as "flowsheets." Such flowsheets typically show a time series progression of different pieces of patient information. Such pieces of patient information are commonly called "parameters," and may include information about indications of patient condition, laboratory test results, assessments, and the administration of treatments. Parameters may also include administrative information, such as details relating to facility, supply, and human resource usage.

The maintenance of patient information in physical charts often has significant disadvantages. Physical charts may only be viewed or modified in a single physical location. Also, data collected automatically from medical sensors and medical laboratories may not be automatically posted to physical charts. Physical charts further are subject to inadvertent destruction, and may contain illegible information. Disadvantages such as the above militate toward automating the maintenance of patient information.

Existing alternatives for automating the maintenance of patient information fall into the categories of general-purpose databases and rigid patient information databases, both of which have significant disadvantages. General-purpose databases generally lack any measure of support for the medical environment, as they generally do not include tools for entering and viewing information in familiar flowsheet formats and do not provide any basis for organizing patient information in a manner useful to health care providers. Rigid patient information databases, on the other hand, define a particular organization of particular parameters. Neither the parameter organization nor the parameters themselves are typically modifiable by the health care provider. It can be difficult for a health care provider to adapt to a rigid organization of patient information. More seriously, a health care provider that deems the tracking of a particular parameters not specified by the rigid patient information database to be necessary to responsible patient care may be precluded from recording these parameters, or may at least be forced to record these parameters manually. The above-discussed drawbacks of general-purpose databases and rigid patient information databases demonstrate a need for a method and system for flexibly organizing, recording, and displaying medical patient care information.

## SUMMARY OF THE INVENTION

The present invention provides a method and system for flexibly organizing, recording, and displaying medical patient care information. In a preferred embodiment, a patient information management facility enables users to customize a patient information hierarchy, which defines and organizes the information that may be stored about each patient, as well as patient data flowsheets, which define views in which the patient data stored according to the hierarchy may be entered and viewed, in a way that is optimized for the structure and procedures of the particular health care organization. The facility enables users to add, modify, and rearrange global or local patient information parameters that make up the hierarchy. Users may define the parameters to be any of a number of types. The user may also customize flowsheets used for entering and displaying result values of parameters defined in the hierarchy for particular patients. The user may expand and contract overview encapsulating parameters to display or hide the encapsulated parameters encapsulated therein. The facility also allows the user to link a result value of one parameter to other parameters, causing the linked-to parameters to be displayed when the result value is entered.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a high-level block diagram of the general-purpose computer system upon which the facility preferably operates.

FIG. 2 is a block diagram showing the contents of the high-capacity storage device of the file and application server computer system.

FIG. 3 is a diagram showing the patient information hierarchy.

FIG. 4 is a tabular diagram showing the parameter definition table.

FIG. 5 is a flow diagram showing the steps performed by the facility in order to create a new parameter.

FIG. 6 is a flow diagram showing the steps preferably performed by the facility in order to display a flowsheet for a particular patient.

FIG. 7 is a diagram showing the contents of a sample result table.

FIG. 8 shows the display of a flowsheet having the sample flowsheet definition.

FIG. 9 is a flow diagram showing the steps preferably performed by the facility in order to display each encapsulating parameter.

FIG. 10 is a screen diagram of the sample flowsheet in which an encapsulating parameter has been expanded.

FIG. 11 is a screen diagram showing the user entering a result value.

FIG. 12 is a flow diagram showing the steps preferably performed by the facility in order to enter a received result value.

FIG. 13 is a display diagram showing the addition of linked-to parameters to the flowsheet in response to the entry of a linked-from result value.

FIG. 14 is a screen diagram showing the addition of a respiration parameter to the sample flowsheet.

FIG. 15 is a flow diagram showing the steps preferably performed by the facility in order to add a parameter to a flowsheet.

FIG. 16 is a flow diagram showing the steps preferably performed by the facility in order to replace such a placeholder with a particular parameter.

FIG. 17 is a display diagram showing the replacement of placeholder 824 with the Ibuprofen parameter 925.

5,682,526

**3**

FIG. 18 is a partial screen diagram showing such a group detail window 1800 that contains indications oft he selected group 1801 and of the selected time 1802.

FIG. 19 is a screen diagram showing the entry of the normal values for the respiratory group 1910 at 1:00 A.M. on Jan. 26th.

FIG. 20 is a screen diagram showing a parameter of the note data type displayed in abbreviated form.

FIG. 21 is a screen diagram showing the display of an entire note parameter result value.

DETAILED DESCRIPTION OF THE INVENTION

A method and system for flexibly organizing, recording, and displaying medical patient care information is provided. In a preferred embodiment, health care organizations are provided with a patient information system. A patient information management facility of the patient information system ("the facility") is comprised of software tools that enable each health care organization to customize the patient information system in a way that is optimized for the structure and procedures of the health care organization. The facility permits users to customize a patient information hierarchy ("the hierarchy"), which defines and organizes the information that may be stored about each patient. The facility further permits users to customize patient data flowsheets ("flowsheets"), which define views in which patient data stored according to the hierarchy may be entered and viewed.

The facility enables authorized users of the patient information system to add to, modify, and rearrange the patient information parameters ("parameters") that make up the hierarchy. If parameters at two different points in the hierarchy have the same name, the parameters may either be global or local. If the parameters are global, they share a single set of result values for each patient. On the other hand, if they are local, the parameters each have their own set of result values for each patient. Users may flexibly define the parameters to be any of a number of types. Many of the parameter types specify a time sequence of values.

The facility further enables users to customize flowsheets that may be used for entering and displaying result values for subsets of the parameters defined in the hierarchy for particular patients. Flowsheets may contain parameters defined in the hierarchy as encapsulating parameters and parameters that are linked to other parameters. When displaying a flowsheet containing an encapsulating parameter that encapsulating one or more other parameters, the facility preferably enables the user to toggle between expanding the encapsulating parameter to display its encapsulated parameters and their result values and contracting the encapsulating parameter to display only the encapsulating parameter name. When displaying a flowsheet containing a parameter defined as a linked-from parameter, if the user enters a result value for the linked-from parameter that is linked to other fields, the facility preferably adds these linked-to parameters to the flowsheet. The flowsheets displayed by the facility may further contain parameter placeholders that the user may replace with particular parameters.

FIG. 1 is a high level block diagram showing the computer network upon which the facility preferably operates. The network connects a file and application server computer system 100 with workstation computer systems, such as 150 and 160, and bedside patient monitor in computer systems, such as 170 and 180. While only a small number of workstation computer systems and bedside patient monitor-

**4**

ing computer systems are shown for clarity, it will be recognized by those skilled in the art that a typical network may contain many more of both types of computer systems. The file and application server computer system 100 contains a high-capacity storage device 110, such as a hard disk drive; one or more central processing units (CPUs) 120; and random access memory 130. The patient information system is maintained on the file and application server 100. Workstation computer systems, such as 150, contain a display device 151 such as a video monitor, a keyboard 152; one or more CPUs 153; and a pointing device 154 such as a mouse. The workstation computer systems 150, 160 may be used to access the patient information system. Bedside patient monitoring computer systems, such as 170, are used for collecting data from electronic medical instruments 173 and displaying it on a touch screen 171. The bedside patient monitoring computer systems 170, 180 also have one or more CPUs 172, and may be used to access the patient information system. While the preferred embodiment is shown in FIG. 1, those skilled in the art will appreciate that the facility may operate on virtually any network configuration.

FIG. 2 is a block diagram showing the contents of the high-capacity storage device 110 of the file and application server computer system 100. The high-capacity storage device 110 contains a facility 211 that enables users to interact with the patient information system. The facility is discussed in greater detail below. The high-capacity storage device contains a patient information hierarchy 212. The patient information hierarchy is used to organize the parameters, in conjunction with which pieces of patient information are stored, in a logical organization from which users may easily select them. Authorized users may modify the hierarchy by adding or deleting parameters, or by relocating parameters within the hierarchy. The patient information hierarchy is discussed in greater detail below in conjunction with FIG. 3. The high-capacity storage device also contains a parameter definition table 213. The parameter definition table contains definitional information for each parameter identified in the patient information hierarchy 212, and is discussed below in greater detail in conjunction with FIG. 4. The high-capacity storage device also contains flowsheet definition templates 214. Authorized users may modify existing flowsheet definition templates and add new flowsheet definition templates. The flowsheet definition templates each define a patient-independent flowsheet for entering and viewing parameters in their result values. Any of the flowsheet definition templates may be used for any patient. The high-capacity storage device further contains patient flowsheet definitions 215. The patient flowsheet definitions are used for particular patients to enter and display parameters and their result values. The patient flowsheet definitions may either be automatically copied ("templated") from the flowsheet definition templates 214, or may be created from scratch. Users may modify patient flowsheet definitions. The high-capacity storage device further contains a result table 216. The result table stores all of the parameter result values corrected for each station. The result table is discussed in greater detail below in conjunction with FIG. 7.

FIG. 3 is a diagram showing the patient information hierarchy, which is comprised of classifications, such as 310 and 320, and parameters, such as 311–331. The classifications correspond to different categories of parameters, under which parameters may be grouped in a way that is logical to users of the patient information system. For example, the assessments classification 310 contains parameters relating to observable aspects of patient condition, while the medi-

A69

EXHIBIT A PAGE 36

5,682,526

5

cations **320** contains parameters relating to the administration of particular medications. The parameters correspond to actual pieces of patient data that may be stored and displayed for each patient. For example, the cough parameter **311** corresponds to a parameter that indicates whether a particular patient at a particular time exhibits no cough, a nonproductive cough, or a productive cough. Each of the parameters contains a parameter identifier ("parameter i.d."). The labels shown in conjunction with each parameter, such as "cough parameter i.d." shown in conjunction with cough parameter **311**, are for illustrative purposes only and not actually stored in the tree comprising the patient information hierarchy. Each of the parameters that constitutes a leaf of the tree, e.g., **311–314, 321–323, 326–328,** and **329–331,** is called a result parameter, and may contain a result value for a particular patient at a particular time. Parameters that are not leaves of the tree, e.g., **320** and **325,** are called encapsulating parameters. Encapsulating parameters may not contain result values, but rather "encapsulate," or represent at a high level, one or more other parameters, called "encapsulated parameters." For example, encapsulating parameter **320** (Demerol) encapsulates encapsulated parameters **321, 322, 323,** and **331** (dose, dose units, route, and site).

FIG. 4 is a tabular diagram showing the parameter definition table. The parameter definition table contains definitional information for each parameter identified in the patient information hierarchy. The parameter definition table **400** contains the following columns, or fields, which may each contain information for each parameter: parameter i.d. column **401,** parameter name **402,** linked-from parameter column **403** which contains an indication of whether the parameter is linked to any other parameters, a parameter data type **404,** a normal value **405** containing a result value for the parameter that a well patient, and a column containing data type-specific information **406.** Table 1 below shows the nature of data type-specific information for several data types.

TABLE 1

| parameter data type | data type-specific information |
|---|---|
| selection | choices, linked parameters i.d.s therefor and primary encapsulated parameter |
| encapsulating | parameter i.d.s of encapsulated parameters |
| calculated | formula |
| string | (none) |
| integer | (none) |
| note | (none) |
| float | (none) |

The rows are preferably indexed on the parameter i.d. column to allow the row for a particular parameter to be quickly retrieved using the parameter i.d. of the parameter. Each row of the table corresponds to a single parameter identified in the patient information hierarchy. For example, the row for parameter i.d. **10001** shows the name of the parameter to be cough, the parameter to be a linked-from parameter, the parameter to be of the select data type, the normal value of the parameter to be none and the selection choices stored in the data-type-specific information column to be none, non-productive, and productive. The data-type-specific information column further indicates that the productive selection choice is linked to the parameters having parameter i.d.s **10013** and **10014.** The row for parameter i.d. **1005** shows that the Demerol parameter is of the encapsulating data type, that it encapsulates the parameters having parameter i.d.s **10007, 10008,** and **10009,** and that the

6

parameter having parameter i.d. **10007** is its primary encapsulated parameter.

Authorized users may create new parameters in order to store and display new pieces of patient information, or to represent an existing piece of patient information at an additional location in the hierarchy. FIG. 5 is a flow diagram showing the steps performed by the facility in order to create a new parameter. In step **501,** the facility prompts the user for the location of the parameter in the hierarchy. Step **501** preferably involves presenting the user with a list of classifications and receiving input from the user selecting one of the classifications. Step **501** further preferably involves displaying a list of the encapsulating parameters for the selected classification and receiving from the user an indication of which of the encapsulating parameters, if any, the new parameter should be an encapsulated parameter of. In step **502,** the facility prompts the user for the name of the new parameter and receives the name of the new parameter from the user. In step **503,** the facility prompts the user for an indication of whether the new parameter is global or local. An indication that the new parameter is local indicates that a new row in the parameter definition table should be created for the new parameter, and that a new, unique parameter i.d. should be assigned to the new parameter. A global indication indicates that the facility should search for an existing parameter in the parameter definition table having the same parameter name, and assign the parameter i.d. of the existing parameter to the new parameter. In step **504,** if the user indicates that the new parameter is global, then the facility continues at step **505,** else if the user indicates that the new parameter should be local, then the facility continues at step **507.** In step **505,** if a parameter definition for the parameter name selected by the user exists, then the facility continues at step **506,** else the facility continues at step **507.** In step **506,** the facility creates a parameter node in the hierarchy containing the parameter i.d. of the existing parameter definition for the selected parameter name. After step **506,** these steps conclude.

In step **507,** the facility creates a new parameter definition in the parameter definition table having the selected parameter name and a new, unique parameter i.d. In step **508,** the facility creates a parameter node in the hierarchy containing the new parameter i.d. In step **509,** the facility prompts the user for the remaining parameter definition information, including parameter data type, normal value, and data type-specific information. The facility preferably uses the data type to determine which data type-specific information to prompt the user for. For example, for a parameter having the encapsulating data type, the facility preferably prompts the user to identify encapsulated parameters, and to indicate which of the encapsulated parameters is the primary encapsulated parameter that is to be displayed in conjunction with the encapsulating parameter when the encapsulating parameter is collapsed. The facility preferably prompts the user for encapsulated parameters by prompting the user to choose them from a list of parameters organized according to the hierarchy. As is discussed in further detail below, to do so, the facility preferably displays a list of default encapsulated parameters associated with the new parameter's classification as encapsulated parameters of the encapsulating parameter, which may each either be retained or deleted by the user. For parameters of the select data type, the facility preferably prompts the user for the selection choices for parameters of the select data type. The facility further preferably prompts the user for any linked-to parameters for each of the selection choices. For parameters of the calculated type, the facility preferably prompts the user for a

EXHIBIT A PAGE 31

5,682,526

formula from which result values for the parameter may be calculated. The facility preferably allows the user to enter such a formula using a special visual interface discussed in detail in U.S. application Ser. No. 08/504,703 which is filed concurrently herewith and is hereby incorporated by reference. In step 510, the facility stores the information received in step 509 and the parameter definition created in step 507. These steps then conclude.

A user may use a flowsheet to display a set of parameters and their result values for a particular patient over a time. FIG. 6 is a flow diagram showing the steps preferably performed by the facility in order to display a flowsheet for a particular patient. In step 601, the facility determines the name of the flowsheet to display, the patient i.d. of the patient for which the flowsheet is to be displayed, and a beginning time at which to begin displaying result values. The user may select either the name of an existing patient flowsheet definition 215, or the name of a flowsheet definition template 214. If a patient flowsheet definition having the selected name exists for the selected patient i.d., the facility loads this patient flowsheet definition in step 602. If no patient flowsheet definition exists for this flowsheet name, the facility preferably copies the flowsheet definition template having this flowsheet name to create a patient flowsheet definition having this name and the patient i.d. of the selected patient in step 602. The facility then loads this new patient flowsheet definition in step 602. Table 2 below shows a sample flowsheet definition.

TABLE 2

| Sample flowsheet definition |
| --- |
| 1 | group respiratory |
| 2 | { | <cough parameter i.d.> 10001 |
| 3 | | <chest sounds parameter i.d.> 10103 |
| 4 | | <endotracheal tube parameter i.d.> 10204 |
| 5 | } |
| 6 | |
| 7 | group medications |
| 8 | { | <Demerol parameter i.d.> 10005 |
| 9 | | <Aminophylline parameter i.d.> 10037 |
| 10 | | <Amoxicillin parameter i.d.> 10006 |
| 11 | | <medication infusions placeholder> 90005 |
| 12 | } |

The sample flowsheet definition is comprised of definitions for two flowsheet groups. A flowsheet group is a collection of parameters that are related for purposes of displaying result values for and adding result values to parameters in the flowsheet. The parameters contained in a particular flowsheet group may be selected from any point in the hierarchy, including points in the hierarchy under different classifications. A respiratory group is defined in lines 1–5, and a medications group is defined in lines 7–12. Each of lines 2–4 identify a parameter in the respiratory group. For example, line 2 identifies the cough parameter of the assessments classification, and contains the parameter i.d. for the cough parameter, 10001. The label text, e.g., "<cough parameter i.d. >", is merely illustrative, and is not actually included in the flowsheet definition. The sample flowsheet definition further contains a parameter placeholder on line 11, which allows users to easily add a particular parameter to the flowsheet during flowsheet use. Lines 3 and 4 identify a chest sounds parameter of the respiratory assessments classification and an endotracheal tube parameter of the tubes classification. The sample flowsheet definition causes the facility to display a flowsheet containing a respiratory group and a medications group. Each parameter identified with each group is displayed in conjunction with its result

values for the relevant period of time. FIG. 8 shows the display of a flowsheet having the sample flowsheet definition, and is discussed in greater detail below.

In steps 602–606, the facility loops through each parameter i.d. contained in the flowsheet definition. Steps 604–605 are therefore repeated for each parameter i.d. In step 604, the facility retrieves the parameter definition for the parameter i.d. from the parameter definition table 400 and caches it in memory, indexed by the parameter i.d. In step 605, the facility retrieves the result values from the result table 700 having the parameter i.d., the current patient i.d., and a time near the beginning time. The facility further caches the retrieved result values in memory, indexed by the parameter i.d.

FIG. 7 is a diagram showing the contents of a sample result table. The sample result table contains parameter i.d. column 701, parameter i.d. column 702, result time column 703, and result value column 704. The table is preferably indexed by the patient i.d., parameter i.d., and result time columns to facilitate rapid retrieval of its rows. Each row of the result table, e.g., 711–718, contains a single result value for a particular parameter at a particular time for a particular patient. For example, row 712 indicates that the patient having patient i.d. 100001 for the respiration parameter having parameter i.d. 100003 at 11:00 p.m. on Jan. 25th had a result value of high. While the contents of the result time and the result value column may be encoded to minimize the storage resources consumed by the result table, the contents of these columns are preferably stored in full textual form in order to ensure that backups of the result table will be restorable. After each parameter i.d. in the flowsheet definition has been processed, the facility continues at step 607. In step 607, the facility displays the group names in the flowsheet definition, and, for each parameter i.d. in the flowsheet definition, the parameter name and result values. These steps then conclude.

FIG. 8 is a screen diagram showing the display of the sample flowsheet 800. The flowsheet displays the name of the patient 801 and the corresponding patient i.d. 802 to identify the patient for which result values are displayed. The flowsheet also displays the name of the flowsheet 803. Along the left, the flowsheet displays the names of the parameters in each of the groups identified in the flowsheet definition. For example, the respiratory group 810 is displayed, which contains the cough parameter 811, the chest sounds parameter 812, and the endotracheal parameter 813. The medications group 820 similarly contains parameters 821–823. To the right of each parameter is a series of cells in which to display result values for that parameter for the designated patient times near the beginning time. Above the cells are time labels 851–855. Each time label represents a point in time for which parameters may have a result value. For example, cell 891 shows that the cough parameter 811 has a result value of none for time 851, i.e., 11:00 p.m. on Jan. 25th.

In FIG. 8, the facility has displayed round bullets in from of parameter names for parameters 821–823, indicating that they are encapsulating parameters rather than result parameters and that they do not directly contain any result values. As discussed above, encapsulating parameters may either be displayed in collapsed form, in which only the encapsulating parameter is displayed (as shown in FIG. 8), or in an expanded form, in which the encapsulated parameters encapsulated by the encapsulating parameter are displayed beneath the encapsulating parameter.

FIG. 9 is a flow diagram showing the steps preferably performed by the facility in order to display each encapsu-

5,682,526

9

lating parameter. The collapsed/expanded state of the encapsulating parameter may be toggled by the user by clicking on the expanded or collapsed indication with which the encapsulating parameter name is displayed. In step **901**, if the encapsulating parameter is collapsed, then the facility continues at step **902**, else if the encapsulating parameter expanded, then the facility continues at step **904**. In step **902**, the facility displays the name of the encapsulating parameter with a round bullet to indicate that the encapsulating parameter is collapsed. In step **903**, if a primary encapsulated parameter is defined in the parameter definition for the encapsulating parameter, the facility displays result values for the primary encapsulated parameter beside the encapsulating parameter. An example is result value **892**, which is a result value for the dose encapsulated parameter of the Demerol encapsulating parameter that is displayed beside the Demerol encapsulating parameter. After step **903**, these steps conclude.

In step **904**, the facility displays the encapsulating parameter name with an expanded indication. FIG. **10** is a screen diagram of the sample flowsheet in which the Demerol parameter **1021** has been expanded. The diagram shows that the Demerol parameter **1021** is displayed with a horizontal bar indicating that the encapsulating parameter expanded. In steps **905–909**, the facility loops through each encapsulated parameter of the encapsulating parameter. Steps **906–908** are therefore repeated for each encapsulated parameter. In step **906**, the facility retrieves and caches the parameter definition for the encapsulated parameter if it is not already cached. In step **907**, if the encapsulated parameter has a result value, the facility retrieves and caches result values for the parameter if result values are not already cached. In step **908**, the facility displays the encapsulated parameter and any result values. If the encapsulated parameter is itself an encapsulating parameter, it has its own collapsed/expanded state, and the facility preferably repeats the steps of FIG. **9** recursively for the encapsulated parameter. FIG. **10** shows the display of encapsulated parameters **1026–1028**, as well as their corresponding result values **1096–1098**. After the facility loops through each encapsulated parameter, these steps conclude.

Users may use a flowsheet to enter one or more result values. Result values may also preferably be entered automatically in response to automatically receiving data from electronic medical sensors or from medical laboratories. If the user enters a linked-from result value, the parameters to which the result value are linked are added to the flowsheet. FIG. **12** is a flow diagram showing the steps preferably performed by the facility in order to enter such a received result value. In step **1201**, the facility receives the result value. In step **1202**, the facility determines the parameter and time for which the result value were received. If the result value is received from a user, step **1202** is performed by determining the parameter and time of the cell that the user selected before entering the result value. FIG. **11** is a screen diagram showing the user entering a result value. The diagram shows the user entering a productive result value **1161** for the cough parameter **1111** at midnight on Jan. 26th. If the result value is received from an external source such as an electronic medical sensor or a medical laboratory, the parameter and time for which the result value was sent is preferably transmitted with the result value. In step **1203**, the facility stores the result value by creating a new row in the result table containing the current parameter i.d., patient i.d., and time and the received result value. In step **1204**, if the cached parameter definition indicates that the current parameter is a linked-from parameter, then the facility continues at

10

step **1205**, else these steps conclude. In step **1205**, if the received result value is a linked-from result value for which linked-to parameters are listed in the parameter definition, then the facility continues at step **1206**, else these steps conclude. In steps **1206–1211**, the facility loops through each linked-to parameter to which the result value is linked. Steps **1207–1210** are therefore repeated for each linked-to parameter. In step **1207**, the facility inserts the parameter i.d. for the linked-to parameter in the flowsheet definition after the linked-from parameter. In step **1208**, the facility retrieves and caches the parameter definition for the linked-to parameter if it is not already cached. In step **1209**, the facility retrieves and caches result values for the linked-to parameter, if not already cached. In step **1210**, the facility displays the linked-to parameter and its result values beneath the linked-from parameter. After the facility processes each linked-to parameter, these steps conclude.

FIG. **13** is a display diagram showing the addition of linked-to parameters to the flowsheet in response to the entry of the productive result value **1361** for the linked-from cough parameter **1311**. Linked-to parameters sputum color **1314** and sputum amount **1315** have been added to the flowsheet and are displayed under the cough parameter **1311**. This permits the user to enter results for these parameters, which often occur in conjunction with the linked-from result value.

Users may also add a parameter to a flowsheet. A new parameter may be added either to a patient flowsheet or to a flowsheet template. FIG. **14** is a screen diagram showing the addition of a respiratory notes parameter **1416** to the sample flowsheet. FIG. **15** is a flow diagram showing the steps preferably performed by the facility in order to add a parameter to a flowsheet. In step **1501**, the facility prompts the user for the identity of the parameter to add to the flowsheet. Step **1501** preferably involves displaying the parameters according to the patient information hierarchy and allowing the user to select one. In step **1502**, the facility inserts the parameter i.d. in the flowsheet definition under the current group of the flowsheet. Table 3 shows the addition of line 4A to the sample flowsheet definition, which contains the respiratory notes parameter i.d. **10251**.

TABLE 3

| | Sample flowsheet definition |
|---|---|
| 1 | group respiratory |
| 2 | {   <cough parameter i.d.> 10001 |
| 3 |     <chest sounds parameter i.d.> 10103 |
| 4 |     <endotracheal tube parameter i.d.> 10204 |
| 4A |     respiratory notes parameter i.d.> 10251 |
| 5 | } |
| 6 | |
| 7 | group medications |
| 8 | {   <Demerol parameter i.d.> 10005 |
| 9 |     <Aminophylline parameter i.d.> 10037 |
| 10 |     <Amoxicillin parameter i.d.> 10006 |
| 11 |     <medication infusion placeholder i.d.> 90005 |
| 12 | } |

In step **1503**, the facility retrieves and caches the parameter definition for the new parameter if it is not already cached. In step **1504**, the facility retrieves and caches result values for the new parameter if they are not already cached. In step **1505**, the facility displays the new parameter and its result values. These steps then conclude.

The facility permits parameter placeholders to be included in flowsheet definitions in order to represent a large number of combinations of parameters that are likely to be displayed

EXHIBIT A PAGE 39

11

on the flowsheet. For example, displaying information about a medication infusion can involve the display of many different combinations of parameters. Placeholders are preferably defined in a table analogous to the parameter definition table. Each placeholder has a placeholder i.d., a name, and a list of parameters with which the placeholder may be replaced by the user. When the flowsheet is displayed, a user may select a display placeholder and replace it with one of its replacement parameters. In response, the facility replaces the placeholders with the selected replacement parameter, including any encapsulated parameters encapsulated by the selected replacement parameter. Placeholders, like parameters, may preferably be created and modified by authorized users in order to optimize them for the procedures of a particular health care organization. A placeholder may also encapsulate one or more other parameters or placeholders. Placeholders and parameters encapsulated by a placeholder are handled in the same manner as other placeholders and parameters. FIG. 16 is a flow diagram showing the steps preferably performed by the facility in order to replace such a placeholder with a particular parameter. These steps are largely similar to those shown in FIG. 15 for adding a parameter to the flowsheet, with the following exceptions: step 1601 prompts the user to select the parameter with which to replace the placeholder from the replacement list defined for the placeholder; step 1602 replaces the selected placeholder in the flowsheet definition with the selected parameter i.d.; and step 1605 displays the selected parameter and its results in place of the placeholder. FIG. 17 is a display diagram showing the replacement of medication infusion placeholder 824 with the dopamine infusion parameter 925.

The facility preferably also enables a user to quickly enter normal result values for each parameter in a group at a particular time. If the user selects a group, such as respiratory group 810 and a time label, such as time label 853 for 1:00 A.M. on Jul. 26th, the facility displays a group detail window. FIG. 18 is a partial screen diagram showing such a group detail window 1800 that contains indications of the selected group 1801 and of the selected time 1802. The window 1800 further contains a table 1810 containing the current result values 1811–1813 for the parameters of the selected group. The window 1800 further contains a normal values button 1823. If the user issues a normal values command by pressing the normal values button, the normal values for each of the parameters in the group are retrieved from their cached parameter definitions and entered as the result values for these parameters at the selected time. FIG. 19 is a screen diagram showing the entry of the normal values for the respiratory group 1910 at 1:00 A.M. on Jan. 26th. For example, the result value for the cough parameter 1911 is none, the normal value for the cough parameter.

Similarly, the facility preferably also enables a user to quickly copy the last result values recorded for each parameter in a flowsheet group forward to a later time. In order to do so, the user presses a last values button 1824 (FIG. 18).

Users may enter result values for parameters of a notes type, which can contain several paragraphs of text. Result values of parameters of the notes type are shown normally shown within a flowsheet in an abbreviated form. FIG. 20 is a screen diagram that showing a note parameter result value 2088 in abbreviated form, which is the last name of the writer. FIG. 21 is a screen diagram showing the display of the entire note parameter result value 2190 when the user selects the cell containing the abbreviated note parameter result value 2188. The entire result value shows all of the information associated with the note, including the full name

12

of the writer 2191, the time at which the note was written 2192, and the complete note text 2193. The user may dismiss the window containing the entire result value by selecting either the OK button 2194 or the cancel button 2195.

The facility farther permits users to specify, for each classification, one or more default parameters. When the user creates a new encapsulating parameter in a classification, the facility displays the default parameters for the classification as proposed encapsulated parameters for the encapsulating parameters. The user may then delete any of the default parameters, and add any other desired encapsulated parameters to the created encapsulating parameters. Default parameters are useful in classifications such as medications, in which many drug parameters encapsulate the same encapsulated parameters, such as dose, dose units, and route.

In an additional preferred embodiment, the facility permits encapsulating parameters, as well as non-encapsulating result parameters, to be defined to contain result values. Those skilled in the art will recognize that the description of the facility described above may straightforwardly be adapted to enable encapsulating parameters to have result values. Such an adaptation merely requires the separation of data type and encapsulating information in the parameter definition table, which is discussed above in conjunction with FIG. 4; separate treatment of encapsulation and data type information in the parameter creation process, which is discussed above in conjunction with FIG. 5; and displaying an encapsulating parameter's result values instead of the result values of a primary encapsulated parameter of the encapsulating parameter beside the encapsulating parameter's name in a flowsheet, which is discussed above in conjunction with FIG. 8.

While this invention has been shown and described with reference to preferred embodiments, it will be understood by those skilled in the art that various changes or modifications in form and detail may be made without departing from the scope of the invention.

We claim:

1. A method in a computer system for designing, under the control of a user, a patient information hierarchy, the hierarchy containing a plurality of parameters including a linked-from parameter having a linked-from possible result value that is linked to one or more linked-to parameters, the method comprising the steps of:

(a) receiving an instruction from the user to create a new parameter within the patient information hierarchy;

(b) in response to step (a), creating a new parameter within the patient information hierarchy;

(c) receiving an instruction from the user to specify a plurality of indicated possible result values for the new parameter;

(d) in response to step (c), specifying the indicated possible result values as possible result values of the new parameter;

(e) receiving an instruction from the user to link an indicated linked-from possible result value among the possible result values of the new parameter to one or more indicated linked-to parameters contained within the patient information hierarchy; and

(f) in response to step (e), within the patient information hierarchy, linking the indicated linked-from possible result value to the indicated linked-to parameters, such that the new parameter is a linked-from parameter, and such that, when the new parameter is displayed for a particular patient, if the new parameter has the linked-

EXHIBIT *A* PAGE 40

5,682,526

**13**

from possible result value, the linked-to parameters are displayed in conjunction with the new parameter.

2. The method of claim 1 wherein step (e) comprises the steps of:

(e)(1) receiving an instruction from the user to link an indicated linked-from possible result value among the possible result values for the new parameter to other parameters within the patient information hierarchy;

(e)(2) in response to step (e)(1), displaying a representation of the patient information hierarchy showing the parameters contained therein; and

(e)(3) receiving one or more indications each indicating that an indicated parameter contained within the patient information hierarchy displayed in step (e)(2) has been selected as a linked-to parameter by the user.

3. The method of claim 1, further including the steps of, for a particular patient:

displaying the linked-from parameter;

receiving a result value for the linked-from parameter;

determining whether the received result value is a linked-from possible result value; and

in response to determining that the received result value is a linked-from possible result value, displaying each of the linked-to parameters that are linked to the linked-from possible result value.

4. A method in a computer system for designing, under the control of a user, a patient information hierarchy, the patient information hierarchy containing a plurality of parameters that may be displayed in conjunction with a particular patient, the parameters including both result parameters that may have a result value for each patient and encapsulating parameters that each identify and encapsulate one or more other parameters to represent them together at a higher conceptual level, the method comprising the steps of:

(a) receiving an instruction to create a first result parameter that may have a result value for each patient, the instruction specifying a parameter name and a data type;

(b) in response to step (a), creating within the patient information hierarchy a first result parameter having the parameter name and data type specified in the instruction received in step (a);

(c) receiving an instruction to create a second result parameter that may have a result value for each patient, the instruction specifying a parameter name and a data type;

(d) in response to step (c), creating within the patient information hierarchy a second result parameter having the parameter name and data type specified in the instruction received in step (c);

(e) receiving an instruction to create a first encapsulating parameter and for encapsulating one or more other parameters to represent them together at a higher conceptual level, the instruction specifying a parameter name and a list of encapsulated parameters, the specified list of encapsulated parameters including the first result parameter and excluding the second result parameter;

(f) in response to step (e), creating within the patient information hierarchy a first encapsulating parameter having the parameter name and the list of encapsulated parameters specified in the instruction received in step (e);

(g) receiving an instruction to display the patient information hierarchy for a particular patient in a user-

**14**

selected flowsheet, the user-selected flowsheet including the second result parameter and the first encapsulatory parameter; and

(h) in response to step (g), displaying a list of parameters including the first encapsulating parameter and the second result parameter and excluding the first result parameter.

5. The method of claim 4, further including the steps of:

(i) after step (h), receiving an instruction from the user to expand the first encapsulating parameter; and

(j) in response to step (i), displaying the encapsulated parameters of the first encapsulating parameter, including the first result parameter, in conjunction with the first encapsulating parameter.

6. The method of claim 5, further including the steps of:

(k) after step (j), receiving an instruction from the user to collapse the first encapsulating parameter; and

(l) in response to step (k), displaying the first encapsulating parameter without the encapsulated parameters of the first encapsulating parameter, including the first result parameter.

7. The method of claim 4, further including the step of receiving an instruction to display the result value for a selected primary one of the list of encapsulated parameters of the first encapsulating parameter as the result value for the first encapsulating parameter, and wherein step (h) includes the step of displaying the result value for the selected primary encapsulated parameter as the result value for the first encapsulating parameter.

8. The method of claim 4 wherein the patient information hierarchy further includes a plurality of classifications each for grouping related parameters, each of the parameters in the patient information hierarchy being associated with one of the classifications, and wherein a set of default encapsulated parameters may be associated with each classification, and wherein step (e) includes the step of receiving an indication of a classification with which to associate the first encapsulating parameter, and wherein step (f) includes the step of defaulting the list of encapsulated parameters of the created first encapsulating parameter to contain the parameters in the set of default encapsulated parameters associated with the classification indicated by the received classification indication.

9. The method of claim 8, further including the step of permitting the user to override the default encapsulated parameters in the list of encapsulated parameters of the first encapsulating parameter.

10. A method in a computer system for designing and maintaining the contents of a patient information hierarchy comprised of a plurality of parameters that may contain result values for a particular patient, the patient information hierarchy having associated with it one or more flowsheets for displaying and modifying the result values of parameters for a particular patient, each flowsheet being comprised of one or more flowsheet groups that specify a subset of the parameters of the patient information hierarchy, the method comprising the steps of:

(a) associating predetermined result values with a plurality of the parameters specified by a selected flowsheet group of a selected flowsheet;

(b) receiving an instruction from the user to display the parameters specified by the selected flowsheet group of the selected flowsheet for a particular patient;

(c) in response to step (b), displaying the parameters specified by the selected flowsheet group of the selected flowsheet for the specified patient;

A74

EXHIBIT _A_ PAGE 41

5,682,526

**15**

(d) receiving an instruction from the user to set to the predetermined result values the result values for the specified patient of the displayed the parameters specified by the selected flowsheet group of the selected flowsheet; and

(e) in response to step (d), for each parameter specified by the selected flowsheet group of the selected flowsheet with which a predetermined result value is associated, storing the predetermined result value in conjunction with the parameter for the specified patient.

11. A method in a computer system for designing and maintaining the contents of a plurality of named parameters identified by parameter identifiers that may contain result values for a particular patient, the parameters being arranged in a patient information hierarchy, the method comprising the steps of:

(a) receiving instructions from a user to create a parameter having a first name at a first location in the patient information hierarchy and a second location in the patient information hierarchy, the instructions further specifying that the parameter having the first name is a global parameter;

(b) in response to step (a), creating parameters at the first and second locations in the patient information hierarchy that are both identified by a first parameter identifier;

(c) receiving instructions from a user to create a parameter having a second name at a third location in the patient information hierarchy and a fourth location in the patient information hierarchy, the instructions further specifying that the parameter having the second name is a local parameter;

(d) in response to step (c), creating a parameter at the third location in the patient information hierarchy that is identified by a second parameter identifier and creating a parameter at the fourth location in the patient information hierarchy that is identified by a third parameter identifier, wherein the second and third parameter identifiers are distinct.

12. The method of claim 11 wherein each result value contained by a parameter is stored in a row of a result table containing the parameter identifier that identifies the parameter, further including the steps of:

(e) receiving a first result value for the parameter having the first name at the first location in the patient information hierarchy;

(f) in response to step (e), storing the first result value in a row of the result table containing the first parameter identifier;

(g) receiving a second result value for the parameter having the first name at the second location in the patient information hierarchy;

(h) in response to step (g), storing the second result value in a row of the result table containing the first parameter identifier;

(i) receiving a third result value for the parameter having the second name at the third location in the patient information hierarchy;

(j) in response to step (i), storing the third result value in a row of the result table containing the second parameter identifier;

(k) receiving a fourth result value for the parameter having the second name at the fourth location in the patient information hierarchy; and

(l) in response to step (k), storing the fourth result value in a row of the result table containing the third parameter identifier.

**16**

13. The method of claim 12, further including the steps of:

(m) after step (e), receiving an instruction to display the result value for the parameter having the first name at the first location in the patient information hierarchy;

(n) in response to step (m), retrieving the first result value from the row of the result table containing the first parameter identifier;

(o) after step (g), receiving an instruction to display the result value for the parameter having the first name at the second location in the patient information hierarchy;

(p) in response to step (o), retrieving the second result value from a row of the result table containing the first parameter identifier;

(q) after step (i), receiving an instruction to display the result value for the parameter having the second name at the third location in the patient information hierarchy;

(r) in response to step (q), retrieving the third result value from a row of the result table containing the second parameter identifier;

(s) after step (k), receiving an instruction to display the result value for the parameter having the second name at the fourth location in the patient information hierarchy; and

(t) in response to step (s), retrieving the fourth result value from a row of the result table containing the third parameter identifier.

14. A method in a computer system for designing and maintaining the contents of a patient information hierarchy comprised of a plurality of parameters that may contain result values for a particular patient, the patient information hierarchy having associated with it a flowsheet for displaying and modifying the result values of a subset of the parameters of the patient information hierarchy for a particular patient, the subset of the parameters that may be displayed and modified using the flowsheet including a parameter of a patient note type, having a result value comprising an author name field, a time field, and a note text field, the method comprising the steps of:

(a) receiving an instruction from the user to display parameter result values for a selected patient using the flowsheet;

(b) in response to step (a), displaying parameter result values for the selected patient using the flowsheet such that the result value of the parameter of the patient note type is displayed in an abbreviated form in conjunction with the other parameters in the subset, such that at least a portion of the author name field is displayed;

(c) receiving an indication that the user has selected the result value of the parameter of the patient note type is displayed in an abbreviated form; and

(d) in response to step (c), displaying the entire contents of the result value of the parameter of the patient note type, such that the complete contents of the author name, time and note text fields are displayed.

15. A method in a computer system for designing and maintaining the contents of a patient information hierarchy comprised of a plurality of parameters that may contain result values for a particular patient, the patient information hierarchy having associated with it one or more flowsheets for displaying and modifying the result values of parameters for a particular patient, each flowsheet being comprised of one or more flowsheet groups that specify a subset of the parameters of the patient information hierarchy, a selected

A75

5,682,526

## 17

flowsheet group of a selected flowsheet further specifying a parameter placeholder not associated with any particular parameter, the method comprising the steps of:

(a) receiving an instruction from the user to display the parameters specified by the selected flowsheet group of the selected flowsheet for a specified patient;

(b) in response to step (a), displaying the parameters and the parameter placeholder specified by the selected flowsheet group of the selected flowsheet for the specified patient;

(c) receiving an instruction from the user to replace the parameter placeholder with a selected parameter of the patient information hierarchy;

(d) in response to step (c), replacing the parameter placeholder specified by the selected flowsheet group of the selected flowsheet for the specified patient with the selected parameter; and

(e) after step (d), displaying the parameters specified by the selected flowsheet group of the selected flowsheet for the specified patient, including the selected parameter and excluding the parameter placeholder.

16. The method of claim 15, further including the steps of:

after step (d), receiving a result value for the selected parameter for the selected patient; and

storing the received result value in conjunction with the selected parameter for the selected patient, and wherein step (e) includes the step of displaying the received result value in conjunction with the selected parameter.

17. The method of claim 15 wherein the parameter placeholder encapsulates an encapsulated parameter, and wherein step (b) also displays the encapsulated parameter.

18. The method of claim 15 wherein the parameter placeholder encapsulates a second parameter placeholder, and wherein step (b) also displays the second parameter placeholder, further including the steps of:

(f) receiving an instruction from the user to replace the second parameter placeholder with a second selected parameter of the patient information hierarchy;

(g) in response to step (f), replacing the second parameter placeholder with the second selected parameter; and

(h) after step (g), displaying the parameters specified by the selected flowsheet group of the selected flowsheet for the specified patient, including the second selected parameter and excluding the second parameter placeholder.

19. The method of claim 15 wherein the selected parameter is an encapsulating parameter encapsulating one or more encapsulated parameters, and wherein step (e) includes the step of displaying the encapsulated parameters of the selected parameter.

20. The method of claim 15 wherein a list of a plurality of parameters of the hierarchy that may be substituted for the parameter placeholder is associated with the parameter placeholder, and wherein step (c) includes the steps of:

displaying the list of parameters that may be substituted for the parameter placeholder; and

receiving input indicating that the user has selected the selected parameter from the displayed list.

21. A method in a computer system for designing, under the control of a user, a patient information hierarchy, the hierarchy containing a plurality of parameters that may each have a result value for each patient, the hierarchy further containing a plurality of classifications each for grouping related parameters, each of the parameters in the patient information hierarchy being associated with one of the

## 18

classifications, and wherein the patient information hierarchy has associated with it one or more flowsheets for displaying and modifying the result values of parameters for a particular patient, each flowsheet being comprised of one or more flowsheet groups that specify a subset of the parameters of the patient information hierarchy, the method comprising the steps of, in response to a step of receiving an instruction from the user to create a new parameter:

(a) prompting the user for the name of a new parameter;

(b) receiving from the user the name of a new parameter;

(c) prompting the user to identify the classification with which the new parameter should be associated;

(d) receiving from the user an indication of the classification with which the new parameter should be associated;

(e) prompting the user to select the data type of the new parameter;

(f) receiving from the user an indication of the data type of the new parameter;

(g) creating in the patient information hierarchy a new parameter that has the received name, that is associated with the indicated classification, and that has the indicated data type;

(h) displaying the parameters specified by a selected flowsheet group of a selected flowsheet in conjunction with their result values for a selected patient, the displayed parameters excluding the new parameter;

(i) receiving an instruction from the user to add a parameter to the selected flowsheet group of the selected flowsheet;

(j) in response to step (i), displaying a portion of the patient information hierarchy including the name of the new parameter;

(k) receiving an instruction from the user selecting the displayed name of the new parameter;

(l) in response to step (k), adding the new parameter to the selected flowsheet group of the selected flowsheet; and

(m) in response to step (l), displaying the new parameter among the parameters specified by a selected flowsheet group of a selected flowsheet in conjunction with their result values for a selected patient.

22. The method of claim 21 wherein step (e) includes the step of prompting the user to select the data type of the new parameter from a plurality of available data types, and wherein the plurality of data types includes a selection data type, parameters of which may contain one of a predefined set of possible result values, and further including the steps of, if the indication of the data type of the new parameter received in step (f) indicates the selection data type:

(h) prompting the user to input the set of possible result values for the new parameter; and

(i) receiving from the user the set of possible result values for the new parameter, and wherein step (g) creates a new parameter having the received set of possible result values.

23. The method of claim 21 wherein step (e) includes the step of prompting the user to select the data type of the new parameter from a plurality of available data types, and wherein the plurality of data types includes a calculated data type, parameters of which may contain a formula based on the result values of other parameters, and further including the steps of, if the indication of the data type of the new parameter received in step (f) indicates the selection data type:

5,682,526

19

(h) prompting the user to input the formula for the new parameter; and

(i) receiving from the user the formula for the new parameter, and wherein step (g) creates a new parameter having the received formula.

**24.** The method of claim **21** wherein step (c) includes the step of displaying a list of the plurality of classifications, and wherein step (d) includes the step of receiving an indication that the user has selected a particular one of the classifications in the displayed list, and wherein step (e) includes the

20

step of displaying a list of available data types, and wherein step (f) includes the step of receiving an indication that the user has selected a particular one of the available data types in the displayed list.

**25.** The method of claim **10** wherein the associating step associates with the plurality of the parameters specified by the selected flowsheet group of the selected flowsheet normal result values for these parameters.

\* \* \* \* \*

EXHIBIT _A_ PAGE _43_

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,992 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

*Counsel for Plaintiffs-Appellants Uniloc Luxembourg S.A. and Uniloc USA, Inc.*

January 17, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2014, an electronic copy of the foregoing Opening Brief was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system.  I further certify that all parties in the case are represented by lead counsel who are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Daniel L. Geyser*
Daniel L. Geyser
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX  75201
Tel.:  (214) 978-4014
Fax:  (214) 978-4044
*dgeyser@mckoolsmith.com*

January 17, 2014